NATHAN STEIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MORITZ STRAUS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MEIER A. STRAUS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

FRIEDRICH A. STRAUS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 83178, 83179, 83180, 83181. Promulgated October 31, 1939.

*Fred R. Angevine, Esq.*, and *Harry W. Forbes, Esq.*, for the petitioners.

*John R. Wheeler, Esq.*, for the respondent.

852

OPINION.

MURDOCK: The first question for decision is whether Straus & Co. had any gross income from sources within the United States within the meaning of section 119 (e) of the Revenue Act of 1928. The only contention made by the Commissioner is that the transactions which the partnership had in drafts drawn on banks in the United States represented "gains, profits and income * * * from the purchase of personal property without and its sale within the United States." Section 119 (e) of the Revenue Act of 1928, upon which he relies, provides that such gains, profits, and income shall be treated as derived entirely from sources within the United States. The argument of the respondent is that Straus & Co. purchased drafts from its clients in Germany and sold those drafts in the United States for more than it had paid for them. The soundness of this argument obviously depends upon two things—first, whether Straus & Co. pur-

chased personal property in Germany, and, second, whether it sold that personal property in the United States. The respondent has neglected to make any argument or cite any authorities to show that Straus & Co. purchased personal property in Germany.

Decisions of courts in the United States uniformly hold that the original negotiation of paper is a loan and not a sale. *Schermerhorn* v. *Talman*, 14 N. Y. 93; *Stirling* v. *Gogebic Lumber Co.*, 165 Mich. 498; 131 N. W. 109; *Bank of Ashland* v. *Jones*, 16 Ohio St. 145; *MacLean* v. *Lafayette Bank*, 16 Fed. Cases, 264. The rationale of those decisions is that a promise or agreement to pay is not property in the hands of the person who makes the promise or agreement, and since there must be a transfer of some property to another for a price in order to constitute a sale, the original negotiation whereby one gives his promise or agreement to pay to another is not a sale but is merely the borrowing of money. The paper is property in the hands of the payee after the completion of the original negotiation, and all subsequent transfers, with the possible exception of the final payment of the paper,[1] may be sales. *First National Bank of Blanchester* v. *Stengel*, 169 N. Y. S. 217; affd., 171 N. Y. S. 1085; *Heinrich* v. *First National Bank of Middletown*, 219 N. Y. 1, 5; 113 N. E. 531; *Ogdin* v. *Goodwin*, 76 Fed. (2d) 196; *Douglas* v. *Federal Reserve Bank of Dallas*, 271 U. S. 489; *In re Ruskay*, 5 Fed. (2d) 143; *Union Electric Steel Co.* v. *Imperial Bank*, 286 Fed. 857. Straus & Co. acquired all of the drafts in question from the original drawers in Germany. Those transactions were not purchases of personal property without the United States, and, consequently, the contention made by the Commissioner must fall.

The respondent cites cases to show that the deposit of a draft in the ordinary course of business, without any special understanding which might color the transaction, is a sale. There is a general rule that the deposit of a draft by one other than the drawer, is a sale. The court said in *First National Bank of Blanchester* v. *Stengel, supra:*

It is a well-understood rule of law that a deposit of a draft or check in the ordinary course of business, the depositor receiving a credit against which he can draw, has the effect of transferring title. The rule is based upon the reason that the check or draft is deposited and received by the bank as so much cash, which immediately becomes the property of the bank. The transaction is a sale. The banker has become absolutely responsible to the depositor. With such a relation existing, the bank, in case of the dishonor of a deposited check or draft, possesses no right to charge back the depositor's account with the amount of the dishonored check or draft. Its sole recourse is to hold the depositor to his liability upon his contract of indorsement. In order for the

---

[1] The redemption of bonds is not a sale. *Fairbanks* v. *United States*, 306 U. S. 436; *Arthur E. Braun, Trustee*, 29 B. T. A. 1161; *John H. Watson, Jr.*, 27 B. T. A. 463.

rule to apply, the deposit must be a naked deposit, and the credit given must be unconditional and unrestricted, and without any special understanding or general usage of business obtaining in the locality which might color the transaction.

The rule applies in New York. See *In re Ruskay*, *supra*, where the court said:

In New York it is not open to question that if a deposit is made by a customer in a bank in the ordinary course of business either of money, or drafts or checks received and credited as money, the title to the money, or to the drafts or checks, is immediately vested in and becomes the property of the bank * * *.

The paper involved in the case of *Union Electric Steel Co.*, *supra*, was a draft payable 60 days after date which was discounted by a bank before maturity. The bank credited the proceeds to the account of the payee. The court said:

When the bill in question was deposited in the bank, discounted, and the proceeds were placed to the credit of the [payee], title to it, in the absence of any agreement to the contrary, was thereafter in the bank. These transactions were the ordinary method of the transfer or sale of the instrument by the holder and the purchase of it by the bank. * * *

The respondent relies upon the rule as stated in the above cases to show that Straus & Co. sold the drafts in the United States when it had them discounted. Those drafts were foreign bills of exchange. Sec. 213, New York Negotiable Instruments Law. They were in form orders from various parties in Germany to banks in the United States for the payment of money to Straus & Co., or its order, on account of the drawer. They were payable so many days after sight. Drafts payable after sight must be presented for acceptance in order to charge the drawee and the drawer and to fix the time for payment. *Richard* v. *Connecticut Electric Manufacturing Co.*, 194 N. Y. S. 497. Acceptance makes the acceptor the principal debtor to the extent of the acceptance and the paper thereby becomes similar to a promissory note, with the acceptor standing in the position of promisor and the drawer standing in the position of a first endorser. *Cox* v. *National Bank*, 100 U. S. 704; *Haddock, Blanchard & Co.* v. *Haddock*, 192 N. Y. 499; 85 N. E. 683; *U. S. Rail Co.* v. *Wiener*, 169 App. Div. 561; 155 N. Y. S. 425.

However, the drafts in this case were somewhat different from ordinary drafts. They were not accepted by the New York banks upon the credit of the drawer, but were accepted upon the credit of Straus & Co. in accordance with the agreement of the latter to pay the accepting bank the full amount of each draft two days prior to its maturity. Thus, when Straus & Co. had the drafts discounted, it was not simply depositing those drafts in the ordinary course of business and receiving credit for the proceeds without any

further obligation, except as an endorser, and it may be that the cases cited by the respondent are not in point. Since Straus & Co. had agreed to pay the amount of the draft to the accepting bank just prior to maturity, it was somewhat in the position of obtaining a loan upon its own promise to pay when it had the drafts discounted. Perhaps that transaction was a loan and not a sale under the cases first cited above, and perhaps an excessive discount rate would have been usury under those cases. No case involving a similar set of facts has come to our attention. However, in view of the holding that Straus & Co. did not purchase personal property without the United States, this point need not be decided. Another point which would have to be decided before the determination of the Commissioner could be approved, would be whether or not there was a fatal difference between the drafts acquired by Straus & Co. in Germany and the bank acceptances which it had discounted in this country. The liabilities of the parties were very different after acceptance from their liabilities before acceptance. The words of the statute relied upon by the Commissioner may refer only to a purchase of personal property and a sale of the same property.

This decision, however, is placed upon the ground that Straus & Co. did not purchase personal property without the United States. The substance of the transactions was, apparently, that Straus & Co. loaned money in Germany at a higher rate than the rate at which it was able to borrow the money in the United States. Its transactions in Germany were loans and its transactions in the United States were in effect borrowings. It derived no profit from the transactions in the United States. Its profit, if any, was earned in Germany from the lending of the money on the credit and risk of its clients. It does not appear that Congress intended to tax that kind of a profit. Cf. sec. 119 (c) (1). Certainly the profit is not taxable under the statutory language relied upon by the Commissioner, and we know of no other provision of the statute under which it would be taxable. We, therefore, hold that the partnership had no taxable income from these transactions.

The petitioners raised the second issue only as an alternative in case of a holding that the partnership had income from sources within the United States from the transactions in foreign bills of exchange. Since that first issue has been decided favorably to the petitioners, the second issue does not arise and need not be decided.

The only question remaining for decision is whether the petitioners are liable for penalties of 25 percent under section 291 for failure to file required returns. These petitioners, nonresident aliens, were required by section 217 to file their returns on or before the fifteenth day of June following the close of each calendar year. The Commissioner has provided in article 1081 of Regulations 74 that a full

and accurate return shall be made for a nonresident on form 1040B of income received from sources within the United States, regardless of amount, unless the tax on such income has been fully paid at the source. Section 51 requires a return to be filed by every individual whose net income is $1,500 or over in the case of a single person, whose net income is $3,500 or over in the case of a married person, or whose gross income is $5,000 or over regardless of the amount of net income. The stipulation shows that the net income of the petitioners from sources within the United States was sufficient to require them to file returns even though the income of the partnership from foreign bills of exchange discounted in this country was not income from sources within the United States. They did not file timely returns and section 291 applies. If no returns were filed, there is no escape from the penalty, whereas if returns were filed late, the penalty may be escaped only by a showing that the failure to file on time was due to reasonable cause and not to willful neglect.

The petitioners filed returns for the calendar years 1929 and 1930 in July 1932. The Commissioner contends that those are not returns because they did not report all income from sources within the United States and did not contain the information required in section 215 (a). However, the provisions of section 291 are entirely different from the provisions of section 215 (a), and it does not appear that a return could not be satisfactory for the purpose of the former without being satisfactory for the purpose of the latter. The petitioners argue that the record contains evidence to show that the failure to file returns on time was due to reasonable cause and not to willful neglect. They point to the letters accompanying the partnership returns stating that the partners were not filing returns because the partnership income was a minus quantity and offering to file returns if requested to do so. They also point to the fact that they filed returns voluntarily before any request was made and despite their belief that no tax was due. The stipulation shows that each petitioner in each year had net income in excess of $3,500 from sources within the United States. It is not clear whether this income was all partnership income, all nonpartnership income, or a combination of partnership and nonpartnership income. The record contains no explanation whatsoever why the petitioners did not file timely returns reporting their nonpartnership income from sources within the United States. The excuse given for failing to report any partnership income from sources within the United States would seem to be that the partners believed that the partnership had deductions in excess of income and that a loss would be deductible by the partners under the revenue act. However, the facts in the record do not disclose how any reasonable person could conclude that the

partnership was entitled to the large deductions claimed, that it sustained losses from its transactions in foreign bills discounted in this country, or that it had losses of any kind which would be deductible by the partners under the revenue act. The Board can not make a finding that their failure to file returns on time was due to reasonable cause and not to willful neglect in the absence of an adequate explanation of their failure to make a substantially correct and timely report of all of their income from sources within the United States. The parties have stipulated the amount of tax due under this decision and we hold that an additional 25 percent of the tax is due under section 291.

*Decisions will be entered under Rule 50.*