**HELVERING, Commissioner of Internal Revenue, v. STEIN.**

**SAME v. STRAUS (three cases).**

**Nos. 4656–4659.**

Circuit Court of Appeals, Fourth Circuit.

Nov. 12, 1940.

Michael H. Cordozo, IV, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and J. Louis Monarch, Sp. Asst. to the Atty. Gen., on the brief), for petitioner.

Fred R. Angevine, of New York City (Harry W. Forbes, of New York City, on the brief), for respondents.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal from a decision (40 B. T.A. 848) of the Board of Tax Appeals (hereinafter called the Board), which was adverse to the Commissioner of Internal Revenue (hereinafter called the Commissioner), and was in favor of the respondents taxpayers (hereinafter called the taxpayers). We are called on here to decide only a single question of law and, as we think this question was correctly decided by

the Board, its decision is, accordingly, affirmed.

The taxpayers were all aliens, nonresidents of the United States, and were partners engaged in the banking business, under the firm name of Straus & Company, at Karlsruhe, Germany. The Commissioner assessed a tax against the taxpayers on the income from certain activities of the taxpayers which followed a conventional and practically uniform pattern, and we must decide whether the income received by the taxpayers from these activities is subject to tax under the income tax laws of the United States.

The taxpayers had credit with banks in the United States and, under this credit, the taxpayers were able to borrow money in the United States. In Germany, the taxpayers had certain customers desirous of borrowing money, who apparently had no credit in the United States; but the taxpayers, who were in a position to ascertain the local reliability and local credit of these customers, were ready and willing to lend money to these customers. The taxpayers could secure money in the United States at a rate of interest less than the rate of interest which the taxpayers could obtain from these German customers. The difference between the two rates of interest thus represented the margin of profit to the taxpayers.

The German customers of the taxpayers would draw a draft payable to Straus & Company on a New York bank. The taxpayers would then negotiate these drafts at a New York bank, but the taxpayers had a contract with the New York bank under which the New York bank agreed to accept these drafts to a certain amount, upon the express undertaking by the taxpayers that the drafts would be paid by the taxpayers two days before the maturity of each draft. It will thus be seen (and this is quite vital, in the instant case) that the drawer of the draft was really a stranger to the New York bank, which did not look to the drawer for payment and which accepted the drafts solely upon the undertaking by the taxpayers that the taxpayers would pay the drafts. In other words, the taxpayers trusted their local customers in Germany; the New York bank trusted the taxpayers. When these drafts were accepted by the New York bank, they then became what is known in the banking business as banker's acceptances, and when (as in this case) the accepting bank was perfectly well known

and absolutely solvent, these banker's acceptances were practically the equivalent of cash. Ordinarily, the taxpayers would turn the money over to their customers only after the money had been received from the New York bank.; but, in some instances, when the need of the local customer was urgent, taxpayers would pay the money to their local customers before the taxpayers had received the money from the New York bank.

■ These drafts were payable so many days after sight, so that presentation of the drafts for acceptance was necessary in order to charge the drawee and the drawer and also to fix the time for payment. Richard v. Connecticut Electric Mfg. Co., 200 App.Div. 681, 194 N.Y.S. 497. Acceptance thereby made the acceptor the principal debtor and the draft then became quite similar to a promissory note, with the acceptor in the position of promisor and the drawer in the position of first endorser. Cox v. National Bank, 100 U.S. 704, 25 L.Ed. 739; Haddock, Blanchard & Co. v. Haddock, 192 N.Y. 499, 85 N.E. 682, 19 L.R.A.,N.S., 136.

Below are the apposite provisions of the federal revenue statutes:

Revenue Act of 1928, c. 852, 45 Stat. 791:

"Sec. [§] 119. Income from sources within United States * * *

"(e) *Income from sources partly within and partly without United States.* Items of gross income, expenses, losses and deductions other than those specified in subsections (a) and (c) of this section, shall be allocated or apportioned to sources within or without the United States, under rules and regulations prescribed by the Commissioner with the approval of the Secretary. * * * Gains, profits and income derived from the purchase of personal property within and its sale without the United States or from the purchase of personal property without and its sale within the United States, shall be treated as derived entirely from sources within the country in which sold * * *.

"(f) *Definitions.* As used in this section the words 'sale' or 'sold' include 'exchange' or 'exchanged'; and the word 'produced' includes 'created', 'fabricated', 'manufactured', 'extracted', 'processed', 'cured', or 'aged.'" 26 U.S.C.A. Int.Rev.Code, § 119(e, f).

"Section [§] 212. Gross income

"(a) *General rule.* In the case of a non-resident alien individual gross income includes only the gross income from sources within the United States." 26 U.S.C.A. Int. Rev.Code § 212(a).

■ It seems to be admitted that the negotiation of these drafts in the United States was the sale of personal property in the United States; but we agree with the Board that there was no purchase of property without the United States—i. e., in Germany. And income from these transactions is taxable in the United States under the Revenue Act of 1928, § 119(e), if, but only if, there has been both a sale of property in the United States and a purchase of that property in Germany. As has already been pointed out, the drafts in question were quite different from ordinary drafts. The New York banks accepted these drafts not upon the credit of the drawer but solely upon the credit of taxpayers, who had agreed to pay the accepting bank the full amount of each draft two days before its maturity. Accordingly, when taxpayers discounted these drafts with the New York bank, they were not merely ordinary endorsers depositing these drafts in the usual course of business and receiving credit for the proceeds.

■■ The decisions of our courts seem to hold pretty uniformly that the original negotiation of commercial paper is a loan and not a sale. Schermerhorn v. Talman, 14 N.Y. 93; Stirling v. Gogebic Lumber Co., 165 Mich. 498, 131 N.W. 109, 35 L.R.A.,N.S., 1106; Bank of Ashland v. Jones, 16 Ohio St. 145; McLean v. Lafayette Bank, 16 Fed.Cas. page 264, No. 8,888. The rationale of these decisions seems to be that a promissory undertaking to pay money is not property in the hands of the person who makes the promise or agreement; for obviously, a person has not, and cannot have, a valid legal claim against himself in the same legal capacity. The negotiation of such paper creates for the first time a legal claim against the negotiator, so that this transaction is a negotiation and not a sale. After such a negotiation, however, a subsequent transfer of the paper may very well be, and usually is, a sale. The original negotiator here did not transfer a claim which he already had; rather did he, by the negotiation, create a claim for the first time.

Accordingly, many of the cases cited in the Collector's brief are obviously not in point. There seems to be no doubt that one who deposits in a bank a check or note of a third person may be said to sell it to the bank. Burton v. United States, 196 U.S. 283, 297, 25 S.Ct. 243, 49 L.Ed. 482; Elmer v. Commissioner, 2 Cir., 65 F.2d 568; Heinrich v. First National Bank, 219 N.Y. 1, 113 N.E. 531, L.R.A.1917A, 655. In these cases just cited, the deposit was of a commercial item which had validity in · the hands of the depositor.

■■ We believe that cases under the celebrated Assignment Statute (Judicial Code, § 24, paragraph 1, 28 U.S.C.A. § 41, paragraph 1,) throw light on the instant problem. This statute prescribes that when the jurisdiction of the United States District Court is invoked on the basis of diverse citizenship, the assignee of a chose in action (with certain exceptions) cannot sue thereon, unless the requisite diversity of citizenship exists at the time the suit is commenced, not only between the assignee and the defendant, but also between the assignor and the defendant. It has been repeatedly held under this statute that the word "assignment" applies only when there is a transfer of an existing chose in action; the statute does not apply when the effect of a particular transaction is to bring into being a new and hitherto non-existent claim. In other words, for this statute to apply, there must be an assignment of a derivative cause of action, not the creation of an original cause of action. Thus, the negotiation of commercial paper by an accommodation payee is not the assignment of an existing cause of action but is rather the creation of a new cause of action. Holmes v. Goldsmith, 147 U.S. 150, 13 S.Ct. 288, 37 L.Ed. 118; Blair v. Chicago, 201 U.S. 400, 26 S.Ct. 427, 50 L.Ed. 801; Skelly Oil Co. v. Cassidy, 8 Cir., 298 F. 699, 702.

■ Manifestly, in our case, the German customers of the taxpayers had nothing which these customers could sell or assign to the taxpayers. The customers, of course, had no rights against themselves and, as they were legal strangers to the New York bank, the bank was under no legal obligation to accept the draft. The New York bank (as has been indicated) did accept the draft solely upon the independent obligation of the taxpayers that the taxpayers would pay the draft two days prior to its maturity. Under these circumstances, and under all the decisions, we do not see how the transfer of the draft by the German customers to

the taxpayers was in any sense, either legal or practical, a sale. On oral argument, counsel for the Collector seemed to argue that though the transactions in Germany did not constitute a legal sale of the drafts, yet these transactions were so similar to sales that they should come within the ambit of the tax statute. We cannot see any validity in that argument.

Section 212(a) of the Revenue Act of 1928 reads: "*General rule.* In the case of. a nonresident alien individual gross income includes only the gross income from sources within the United States."

As a perfectly practical matter, if the taxpayers derived any income as a result of the transactions conducted in the United States, the income was received without, and not within, the United States. These taxpayers received from the New York bank less than they ultimately had to pay the bank. They had to pay to the bank the full amount of the draft, they received from the bank a sum of money equal to the face of the draft, minus commissions and interest. The profit of the taxpayers was realized by virtue of the fact that they lent the money in Germany to their local customers at a much higher rate of interest than the taxpayers were compelled to pay to the New York bank.

Finally, these transactions may be viewed from the standpoint of the mythical commercial man of the street. Such a man, we are convinced, would have little difficulty in practically classifying the transactions in question. He would say that what these taxpayers were doing here was simply borrowing money in the United States at a low rate of interest and lending this money in Germany at a higher rate of interest. We do not think the use of drafts instead of promissory notes in these transactions goes beyond the form of the transaction. And, had the German customers given to the taxpayers promissory notes of the customers (rather than drafts), then very clearly there would be no assignment or sale of any property in Germany. Nor could it be said that drafts were used here instead of promissory notes merely for the purpose of evading our tax statutes. There were obvious commercial advantages in using drafts. The name of the taxpayers did not appear on these drafts as borrowers, and it is well known that bankers often prefer not to have their names appear as borrowers. Again, a draft, when accepted by the New York bank, became a banker's acceptance, which can be discounted more readily than a promissory note.

We are convinced that the decision of the Board of Tax Appeals in this case was altogether sound; its decision is, accordingly, affirmed.

Affirmed.