LAMAR AND NORMA K. HUNT, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 30547-81—30549-81,     Filed June 28, 1988.
1385-82— 1387-82,
465-83,     498-83,
538-83.

*Donald P. Lan, Jr., Drew R. Heard, Ivan Irwin, Jr., Clive D. Bode,* and *Joyce R. Scruggs,* for the petitioners.

*Raymond L. Collins* and *Gary A. Benford,* for the respondent.

SHIELDS, *Judge:* Respondent determined deficiencies in petitioners' income taxes as follows:

---

[1]Cases of the following petitioners are consolidated herewith: Lamar and Norma K. Hunt, docket Nos. 1385-82 and 465-83; N.B. and Caroline L. Hunt, docket Nos. 30548-81, 1386-82, and 498-83; W.H. and Nancy B. Hunt, docket Nos. 30549-81, 1387-82, and 538-83.

| Petitioner | Docket No. | Tax year | Deficiency |
|---|---|---|---|
| Lamar and Norma K. Hunt | 30547-81 | 1972 | $35,105.32 |
| | | 1974 | 41,340.35 |
| | | 1975 | 11,741.64 |
| | 1385-82 | 1976 | 8,495.69 |
| | | 1977 | 1,033,259.02 |
| | 465-83 | 1978 | 928,429.93 |
| N.B. and Caroline L. Hunt | 30548-81 | 1974 | 4,048,294.48 |
| | | 1975 | 16,096.39 |
| | 1386-82 | 1976 | 97,914.61 |
| | | 1977 | 14,796.91 |
| | 498-83 | 1978 | 2,877,515.44 |
| W.H. and Nancy B. Hunt | 30549-81 | 1974 | 646,736.68 |
| | | 1975 | 25,613.13 |
| | 1387-82 | 1976 | 25,628.76 |
| | | 1977 | 540,111.72 |
| | 538-83 | 1978 | 814,531.97 |

After concessions, the sole issue to be decided is whether income in 1974 attributable to certain crude oil should be sourced in Libya for purposes of calculating petitioners' foreign tax credit under section 901.[2]

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference.

All petitioners were residents of Dallas, Texas, at the time their petitions were filed. Petitioners in each case filed joint Federal income tax returns with the Internal Revenue Service Center at Austin, Texas.[3]

### A. HIPCO and Operations in Libya

Lamar Hunt, N.B. Hunt, and W.H. Hunt (hereinafter sometimes referred to as petitioners) were partners in Hunt International Petroleum Co., Libyan Project Lease (HIPCO) during the years at issue. Their respective interests in the partnership were 12.5 percent, 75 percent, and 12.5 percent.

---

[2] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the tax year in issue, unless otherwise indicated. All Rule references are to the Tax Court Rules of Practice and Procedure.

[3] Petitioners' returns were prepared using the calendar year and an accrual method of accounting.

HIPCO was a Texas general partnership and at all relevant times used the accrual basis of accounting and a calendar year for filing its Federal partnership returns.

In 1957, N.B. Hunt acquired, pursuant to the Libyan Petroleum Law of 1955, an oil concession (Concession No. 65) under which he was entitled to extract any oil found within certain defined geographic boundaries within Libya and to process, export, or otherwise dispose of such oil. In exchange for these rights, N.B. Hunt was required to make annual payments to Libya for fees, surface rents, royalties, income taxes, and other imposts. N.B. Hunt subsequently assigned his interest in the concession to HIPCO. However, all operations by HIPCO under the concession were conducted in the name of N.B. Hunt.[4]

HIPCO's business was the production and sale of crude oil. During all relevant periods, HIPCO was not an integrated company since it had no refining facilities, no tankers, and no storage facilities. During such periods it had offices in London, New York, and Texas. At no time did HIPCO maintain any office, or have any employees in any of the Persian Gulf nations.

In 1960, HIPCO assigned an undivided one-half interest in Concession No. 65 to BP Exploration Co. (Libya) Limited (BP). In the assignment, BP agreed to have its employees conduct all field operations required with respect to the concession.[5] However, HIPCO was individually responsible for its share of the imposts due to Libya and for all sales of oil extracted from the concession.

Subsequently, the Sarir Oil Field was discovered in Concession No. 65. By 1970, this field was not only producing approximately 400,000 barrels of crude oil per day or about 146 million barrels per year but Sarir crude oil also had a low sulfur content, a high gasoline yield, and required less refining than the heavier crudes found in the Persian Gulf nations. For these reasons, and because of Libya's proximity to Mediterranean markets, Sarir crude oil was more valuable than Persian Gulf crude oil.

---

[4]The parties have agreed that references to N.B. Hunt or Nelson Bunker Hunt in their stipulations and exhibits denote the business entity known as HIPCO.

[5]Except for a brief period of time in early 1972 (after Libya nationalized BP's one-half interest in Concession No. 65) HIPCO personnel conducted no field operations.

However, in 1970, production from the Sarir Field began to be seriously jeopardized by threats of production cutbacks, prohibitions on lifting crude oil, and even possible nationalization by the new Libyan regime headed by Colonel Mu'ammer al-Qadhadhafi (Qaddafi). The threats were made in the form of demands by Qaddafi to increase the "posted price" of Libyan crude oil, which was the base used in computing the taxes, royalties, and other imposts due Libya under existing oil concessions. When the demands were not satisfied, Qaddafi adopted the strategy of singling out vulnerable companies (independent companies[6] which engaged in production solely in Libya) to force capitulation by threats of, and in some cases actual, production cutbacks.

The success of Libya's tactics led Persian Gulf nations to begin to make similar demands on the major oil companies. For instance, in December 1970, the Organization of Petroleum Exporting Countries (OPEC)[7] passed a resolution which mandated joint negotiations between its members and all major oil companies. One of the purposes of the resolution was to increase the "government take"[8] by the Persian Gulf nations from the major companies to the level that had been obtained by Libya from the independent companies operating within its boundaries.

Shortly thereafter, Libya summoned the local representatives of the oil companies operating in Libya and outlined to such representatives a plan for implementing the OPEC resolutions. The plan contained "non-negotiable" demands for further increases in taxes and other imposts. On January 9, 1971, the Libyan Government singled out HIPCO and one other oil company operating in Libya to "accept" the nonnegotiable demands no later than January 16, 1971, or face further production cutbacks, prohibitions on lifting crude oil (known as shut-ins), or nationalization.

---

[6]References throughout this opinion to "independent" companies means oil companies engaged, either independently or in joint ventures, in oil production in Libya with no significant Persian Gulf production. Companies which engaged in both Libyan and Persian Gulf production are referred to as "major" companies and include Mobil Oil Corp., Texaco, Inc., Standard Oil of California, Shell Petroleum Co., Ltd., Exxon Corp., and BP. HIPCO was at all times an independent company.

[7]Libya was a member of OPEC at all times.

[8]The term "government take" has been used to refer to the taxes, royalties, rents, and other imposts required to be paid by an oil producer to the government in whose country production was located.

## B. *Industry Response*

Libya's escalating demands and the effect they were having on oil production in Libya and the Persian Gulf nations led the executives of major and independent oil companies to consider a unified means of resisting Libya and OPEC. As a result, discussions of the problem commenced in several areas of the oil industry, and a group of chief executives of the seven major oil companies (the McCloy Group) arranged a series of meetings which commenced on January 11, 1971. The stated purpose of the meetings was to attempt to negotiate a formal and unified response to the Persian Gulf nations and Libya, i.e., OPEC. Representatives of all of the major oil companies and most of the independent oil companies, including HIPCO, attended the meetings which were held in New York and Washington. The Department of Justice and Department of State of the United States were also represented.[9] HIPCO was represented by N.B. Hunt, Henry M. Schuler, and Ed Guinn.

During the series of meetings, two plans for handling the OPEC and Libyan demands were developed. Basically, the first was to negotiate a unified response to OPEC and the additional demands of Libya, and the second, was to negotiate a sharing arrangement to help the oil companies operating in Libya resist the escalating Libyan demands. The crux of the sharing arrangement was to assure the independent oil companies operating in Libya that the burden of any further cutbacks imposed by the Qaddafi government would be borne by both the major and independent oil companies.

After extensive negotiations, a message to OPEC was executed by all oil companies which had representatives in attendance at the meetings. The message called upon OPEC to conduct an "all-embracing negotiation" with a team of representatives from the oil companies. In addition to the message to OPEC, a sharing arrangement was negotiated to deal with the specific problem of Libya.

---

[9]Representatives from these departments provided reassurances that the participating oil companies would not face antitrust problems and that the negotiations were not contrary to national interests.

Before its final adoption, the sharing arrangement underwent several revisions with drafts and amendments being offered by various companies. However, throughout the negotiations, one theme was consistently articulated which was that, in order to solidify a unified negotiating front, no company operating in Libya was to accept any increase by Libya in "government take" without the prior approval of the other companies. Further, all the signatory companies were to share the burden of any cutback in production imposed by the Libyan Government by providing the resisting company with "substitute" Libyan crude oil at "tax-paid cost." Substitute Libyan crude oil was to be provided by each company in proportion to that company's share of the total Libyan production of all the companies who were parties to the sharing arrangement. The term "tax-paid cost" was defined as the per barrel cost of extracting the crude oil, including royalties, taxes, and other payments required to be made by the producer to the producing country. Tax-paid cost did not include any profit element to the producing company.

In the negotiations, it was initially contemplated that a company whose production was cutback by Libya would receive only Libyan oil as a substitute for the cutback. However, it was soon recognized that it might not be possible to provide Libyan oil as a substitute in all situations. Consequently, it was agreed that Persian Gulf oil (referred to as back-up Persian Gulf oil) could be provided as a substitute for Libyan oil under the sharing program. Still later in the negotiations, it was also recognized that, at times, it might not be possible to provide either Libyan or Persian Gulf oil as a substitute. Consequently, an option was provided for the payment of "dimes," or 10 cents in lieu of each barrel of Persian Gulf oil owed under the sharing arrangement.

On January 15, 1971, the aforesaid series of meetings and negotiations resulted in the execution of the Libyan Producers' Agreement (LPA) by 15 oil companies. Subsequently, two more companies executed the agreement. The preamble to the agreement recognized that the parties "might suffer serious financial consequences which would not be fully

alleviated by the limited mutual self-help provisions of this agreement."

Under the provisions of the LPA, if an obligation to provide substitute Libyan crude oil was triggered in 1971 by Libyan Government action against one signatory to the agreement, 100 percent of any cutback was to be shared by all parties to the LPA.[10] During 1972 and 1973, the percentage of cutbacks to be shared by all signatories to the LPA was reduced from 100 percent to 80 percent and 60 percent, respectively.[11] Substitute Libyan oil was to be provided by each obligor under the LPA at tax-paid cost f.o.b. Libyan port on a basis proportionate to its share of total Libyan production during the first full calendar month preceding the first cutback.

If substitute Libyan oil was unavailable due to Libyan restrictions, a cutback company was entitled to receive backup Persian Gulf crude oil. In addition, an independent oil company, but not a major oil company, was entitled to receive backup Persian Gulf crude oil when the independent company was obligated to supply substitute Libyan crude to another company under the LPA or was shut in by Libya. Backup Persian Gulf crude was to be supplied at tax-paid cost f.o.b. Persian Gulf ports.

The sharing provisions of the LPA with respect to substitute Libyan crude and backup Persian Gulf crude became more complex where more than one signatory was cut back due to Libyan Government action. Further, operations under the LPA were also complicated by the provision which permitted the payment of dimes in lieu of providing backup Persian Gulf crude oil.[12]

Originally the LPA addressed cutbacks occurring only through 1973. However, a supplement to the LPA was

[10]For 1971, a company was considered "cut back" and entitled to substitute Libyan oil to the extent of its average daily level of production prevailing in December 1970 less actual average daily production permitted by the Libyan Government, plus production voluntarily shut-in by the company where such production would be economically unfeasible due to Libyan Government cutbacks.

[11]For 1972 and 1973 a company was considered cut back to the extent of the lesser of the company's average daily level of production prevailing in December 1970 or the actual average daily production level in the calendar quarter immediately prior to such cutback, both of which were to be reduced by actual production permitted by the Libyan Government and increased by the production voluntarily shut-in because production became uneconomical due to Libyan cutbacks.

[12]Because of the crude-short position which developed in 1972, the option to provide "dimes" was renegotiated and increased to 15 cents in that year.

executed which extended the terms through December 31, 1974.[13] Under the supplement, the signatories agreed to share 60 percent of any cutback occurring in 1974, and a company was considered cut back for purposes of determining an entitlement to substitute Libyan oil to the extent of its average daily level of production for the month of October 1972. The base for computing entitlement to backup Persian Gulf crude oil remained at the November 1971 level under the supplement.

The LPA did not restrict any signatory from purchasing Libyan or Persian Gulf crude oil at fair market value on the open market.

## C. *Nationalization of Oil Concessions in Libya*

On January 16, 1971, the day after the message to OPEC was published, HIPCO advised Libya that HIPCO would not accept the nonnegotiable demands made by Libya on January 9, 1971. However, in April 1971, HIPCO and the other oil companies operating in Libya were forced to enter into separate 5-year agreements with Libya concerning, among other things, increases in posted prices and tax rates; and, before the end of 1971, new demands were being made by Libya as well as OPEC.

Furthermore, on December 7, 1971, the Libyan Government nationalized BP's one-half interest in Concession No. 65.[14] The nationalization of BP's interest was the first cutback of oil after the execution of the LPA, and thus, constituted the first time the sharing provisions of the agreement were triggered.

The BP nationalization also thrust HIPCO into a partnership with the Arabian Gulf Exploration Co. (AGECO) which was created by Libya to replace BP as part owner of Concession No. 65. Immediate tensions developed between AGECO and HIPCO which led to production cutbacks in early 1972, a shut-in at the end of 1972, and ultimately to nationalization of HIPCO's interest on June 10, 1973.

---

[13]The supplement dated Nov. 21, 1972, was executed by some but not all of the original signatories of the LPA.

[14]Qaddafi's nationalization of BP's interest was an act of political reprisal against the British Government allegedly for Britain's position in a controversy between Iran and several Persian Gulf sheikdoms.

## D. *Implementation of the Libyan Producers' Agreement*

In 1972 and 1973, the production restrictions in Libya and the Persian Gulf nations resulted in extreme oil shortages. Even major companies, such as Gulf, became crude-short, i.e., their entitlements were insufficient to meet system demands and customer commitments. Needless to say these sudden changes in the crude position of oil companies significantly affected the calculations of entitlements and obligations under the LPA. For instance, Libya's nationalization of HIPCO and other companies[15] placed some of the major companies in an entitlement position with respect to substitute Libyan crude oil, while remaining an obligor to other companies for backup Persian Gulf crude oil.

To implement the terms of the LPA, its signatories established the London Policy Group (LPG) to develop a policy for negotiations with Libya. Another group, the New York Group (NYG), was formed to maintain communications between the LPG and American oil companies and to provide technical services to the LPG. Each signatory to LPA had a representative on both the LPG and the NYG. Also, the Libyan Emergency Supply Subcommittee (LESSCOM) was established by LPA signatories as a subcommittee of the NYG to develop procedures for claiming and supplying substitute Libyan and back-up Persian Gulf crude oil.

A system for claiming substitute and backup crude was implemented and maintained in New York by LESSCOM with the assistance of Price Waterhouse & Co. which was retained by LESSCOM to maintain the necessary accounting records.[16] Basically, the system consisted of periodic reports circulated by LESSCOM among LPA signatories which reflected the companies entitled to receive and those obligated to provide crude under the LPA. Upon receipt of such a report, a company entitled to receive backup or substitute crude would send a cable (nominating cable) directly to a company obligated to provide such oil that a vessel would

---

[15]In 1973, Libya nationalized 51 percent of each of the concessions held by Occidental, Exxon, Mobil, Shell, Socal, Texaco, ARCO, Grace, and Gelsenberg.

[16]In addition to maintaining the accounting records, Price Waterhouse served as a general watchdog for LESSCOM with respect to entitlements under the LPA.

be available to take a particular amount of crude oil at a designated time and port. A company receiving a nominating cable would, by return cable, accept or reject the nomination. If accepted, a nomination was confirmed by a sailing cable at the time the loaded vessel departed. LESSCOM and Price Waterhouse received copies of each of these cables.

Requests for payment by the company which provided the backup or substitute oil were sent to Price Waterhouse which would forward the request for payment of the tax-paid cost to the recipient of the oil. To protect proprietary information, a request for payment of tax-paid cost was made only after deliveries of more than one type of crude oil,[17] and payments of tax-paid cost were made with Price Waterhouse acting as an intermediary.[18]

In 1973 and 1974, HIPCO was entitled to and did receive more substitute Libyan crude oil and more backup Persian Gulf crude oil than it was required to provide to others under the LPA. All of the backup Persian Gulf crude oil received by HIPCO was supplied under the LPA as amended by the 1972 supplement.

### E. *HIPCO Sales of Crude Oil*

In 1972, HIPCO executed contracts with its customers under which it agreed to sell Libyan crude oil, together with quantities of substitute Libyan and backup Persian Gulf crude oil provided to HIPCO under the LPA.[19] The backup Persian Gulf crude oil covered by these contracts was lifted by HIPCO's customers f.o.b. Persian Gulf. Other contracts to sell backup Persian Gulf crude oil were consummated by HIPCO in 1974. The 1974 contracts included sales to companies which were not HIPCO customers when the LPA was executed. Again, the crude was lifted by the purchaser f.o.b. at Persian Gulf ports.[20] In each of these transactions, HIPCO executed a nomination to an LPA obligor and the

---

[17] A request for payment of tax-paid cost indicated the total dollar amounts involved and did not specify the individual tax-paid cost per barrel.

[18] Actual payments and disbursements were made through a New York City bank where an account was maintained by LESSCOM.

[19] All of the contracts of sale which were submitted as exhibits in these cases were executed in HIPCO's offices located in either Dallas or London.

[20] Contracts between HIPCO and its customers provided that title to and risk of loss passed to the purchaser at the "flange," i.e. the connection between the dockside delivery hose and

crude was delivered by the accepting obligor directly to a tankship provided by HIPCO's customer.

During the term of the LPA, obligors supplied to HIPCO approximately 15 million barrels of Libyan crude oil and more than 36 million barrels of Persian Gulf crude oil. In addition, LPA obligors paid a total of $414,300 to HIPCO as "dimes" in lieu of crude oil. In a few isolated instances in 1974, Nigerian and Northern Ireland crude was supplied to HIPCO in satisfaction of obligations by other signatories to the LPA to supply Libyan and Persian Gulf oil. The oil was supplied to HIPCO's customers f.o.b. at the country of production.

Income from petitioners' sales of oil made available under the LPA was computed by reducing the sales price paid by HIPCO's customers by the total tax-paid cost paid by LESSCOM to supplying LPA obligors. In 1974, no taxes were paid by HIPCO directly to Libya on the profits earned from sales of backup Persian Gulf crude.

## OPINION

During 1973 and 1974, petitioners claimed foreign tax credits for taxes paid by their partnership HIPCO to Libya.[21] In calculating the amount of their credits, petitioners used the per-country limitation of section 904(a)(1) and sourced the income derived from sales of backup Persian Gulf crude oil in Libya.

In his notices of deficiency, respondent disallowed the carryover of 1973 Libyan credits to the 1974 tax year on the basis that the income derived from sales in 1973 of backup crude was properly sourced in Persian Gulf na- tions.[22] The issue we are asked to resolve is whether the income attributable to sales of backup Persian Gulf crude oil should be sourced within Libya for purposes of calculat-

the vessel's cargo intake connection. In addition, HIPCO warranted "full and complete title to all oil sold" under the sales agreements.

[21]Only the 1974 tax year is in issue, however the foreign tax credit involves credit carryovers from 1973 (see sec. 904(d)), which petitioners were unable to use in earlier years due to the limitation prescribed by sec. 904(a)(1).

Respondent does not dispute that the taxes paid to Libya were creditable taxes under sec. 901(b).

[22]Respondent does not dispute that Libya was the source of income derived from sales of substitute Libyan crude oil and from the payment of dimes.

ing the amount of petitioners' allowable foreign tax credit in 1974.

Section 901 provides that a taxpayer is allowed a credit against his Federal income tax for taxes paid or deemed paid to a foreign country. The amount of the credit is limited, however, by section 904 which provides a "per-country" limitation (section 904(a)(1)) or, if elected, an "overall" limitation (section 904(a)(2)).[23] The per-country limitation is computed separately as to the taxes in each separate foreign country. *Texas Instruments Inc. v. United States,* 551 F.2d 599 (5th Cir. 1977). Furthermore, under section 904(a)(1)[24] the credit for taxes paid to a particular foreign country may not offset a greater share of the taxpayer's U.S. taxes than the earnings sourced in that country comprised of the taxpayer's total earnings. *Anderson, Clayton & Co. v. United States,* 562 F.2d 972 (5th Cir. 1977), cert. denied 436 U.S. 944 (1978). To the extent the taxes paid to a foreign country in a taxable year exceed the per-country limitation for that year a carryback and carryforward are authorized for the excess under limited circumstances. Sec. 904(d).

In *F.W. Woolworth Co. v. Commissioner,* 54 T.C. 1233, 1264 (1970), we algebraically expressed the per-country limitation by means of the following formula:

$$\text{Maximum credit allowed for taxes paid to country in question} = \frac{\text{Taxable income from country in question}}{\text{Total taxable income}} \times \text{U.S. tax before credit for foreign taxes}$$

Section 1.901-2(d), Income Tax Regs.,[25] provides that the

---

[23]For tax years after Dec. 31, 1975, the per-country limitation has been repealed. Pub. L. 94-455, sec. 103(a), 90 Stat. 1620.

[24]As in effect in 1974, sec. 904(a)(1) provides as follows:

SEC. 904(a). ALTERNATIVE LIMITATIONS.—

(1) PER-COUNTRY LIMITATION.—In the case of any taxpayer who does not elect the limitation provided by paragraph (2), the amount of the credit in respect of the tax paid or accrued to any foreign country or possession of the United States shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources within such country or possession (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year.

[25]Sec. 1.901-2(d), Income Tax Regs., as in effect in 1974 is as follows:

(d) The principles of part I (section 861 and following), subchapter N, chapter 1 of the Code, and the regulations thereunder shall apply in determining the sources of income for the purposes of subpart A (section 901 and following) of such part III. [26 C.F.R. sec. 1.901-2(d) (1974).]

principles set forth in sections 861 to 863 and the regulations issued thereunder shall apply for purposes of determining the source of income for foreign tax credit purposes, i.e., the numerator in the fraction used in the above formula. The income-sourcing provisions of sections 861 and 862 classify various categories of gross income as deriving from "within the United States" or sources "without the United States."[26] The provisions do not contain a comprehensive rule for identifying an item of income with a particular foreign country. Nevertheless, the rules show that Congress sought to identify the source of income in terms of the business activities generating the income or to the place where the income was produced. See *Howkins v. Commissioner*, 49 T.C. 689, 694 (1968).[27]

Thus, the sourcing concept is concerned with the earning point of income or, more specifically, identifying when and where profits are earned. *Commissioner v. East Coast Oil Co.*, 85 F.2d 322, 323 (5th Cir. 1936), affg. 31 B.T.A. 558 (1934), cert. denied 299 U.S. 608 (1936).

Respondent's argument in this case is founded on the source of income rules applicable to sales of personal property under sections 861(a)(6) and 862(a)(6). Such income is generally sourced to the country where all right, title, and interest in the personal property are transferred to the purchaser. This concept of sourcing income according to the place of effective delivery of title to property is often referred to as the "title passage" rule, and applies to most sales of personal property,[28] except in the case of income from the sale of personal property which is acquired by production, manufacture, extraction, or processing. In situations where income is generated from sales of personal property acquired by production or other processing, section

---

[26]The categories of income for which specific rules for determining the source of the income rules are provided by statute are interest, dividends, compensation for personal services, rentals and royalties, sales of real property, and sales of personal property. See secs. 861(a) and 862(a).

[27]*Howkins v. Commissioner*, 49 T.C. 689 (1968), required the sourcing of an item of income not specifically covered by the categories of income set forth in the sourcing provisions. In *Howkins* we sourced the income (alimony) by comparison and analogy with the classes of income delineated by statute. Also see *Bank of America v. United States*, 230 Ct. Cl. 679, 680 F.2d 142 (1982).

[28]Cf. *British Timken Ltd. v. Commissioner*, 12 T.C. 880 (1949) (while title was transferred in Canton, Ohio, the income was sourced without the United States since the income did not derive from the profit margin between purchase and sale price, but rather from sales activities solely in Britain).

863(b)(2) generally sources the income partly to the place of production and partly to the place of sale.

Respondent's position in this case is that petitioners' income which is attributable to sales of backup Persian Gulf crude is sourced without Libya pursuant to the title passage rule of sections 861(a)(6) and 862(a)(6). Respondent relies upon section 1.861-7, Income Tax Regs., which provides in pertinent part as follows:

> Sec. 1.861-7 *Sales of personal property.*
>
> (a) *General.* Gains, profits, and income derived from the purchase and sale of personal property shall be treated as derived entirely from the country in which the property is sold.
>
> \* \* \* \* \* \* \*
>
> (c) *Country in which sold.* For the purposes of part I (section 861 and following), subchapter N, chapter 1 of the Code, and the regulations thereunder, a sale of personal property is consummated at the time when, and the place where, the rights, title, and interest of the seller in the property are transferred to the buyer. Where bare legal title is retained by the seller, the sale shall be deemed to have occurred at the time and place of passage to the buyer of beneficial ownership and the risk of loss. However, in any case in which the sales transaction is arranged in a particular manner for the primary purpose of tax avoidance, the foregoing rules will not be applied. In such cases, all factors of the transaction, such as negotiations, the execution of the agreement, the location of the property, and the place of payment, will be considered, and the sale will be treated as having been consummated at the place where the substance of the sale occurred.

From the foregoing, respondent determined that the income generated by the backup crude oil is not sourced in Libya but in the Persian Gulf nations where title was transferred. Thus, such income does not constitute income sourced within Libya for purposes of increasing the numerator in the fraction for computing the applicable per-country limitation.

Respondent's determination is presumptively correct, and petitioners bear the burden of proving that the income is properly sourced within Libya. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111 (1933). Petitioners contend that section 1.861-7, Income Tax Regs., is not applicable to their situation because HIPCO never acquired title to the backup crude. Consequently, there is no basis for referring to the title passage rule. We agree with petitioners' premise that

section 861(a)(6) and section 1.861-7, Income Tax Regs., require a purchase and a sale of personal property before the title passage rule can apply.[29] However, we are satisfied that both a purchase and a sale did occur under the facts of this case.

The essence of the LPA was to provide a ready supply of oil to one or more of its signatories at a reasonable price in the event their supply ordinarily obtained through extraction was jeopardized by Libyan cutbacks. The oil was provided to cutback signatories at a specified cost, i.e., "tax-paid cost." Petitioners' insistence that no purchase occurred and that they never acquired any title to transfer to their customers is without merit. The record is replete with evidence that through the mechanics of the system set up and operated by LESSCOM and Price Waterhouse, HIPCO purchased the Persian Gulf crude at a determinable cost and almost simultaneously sold it, in most instances, at a profit. From the record as a whole, it is apparent that through the use of nominating cables, HIPCO purchased the Persian Gulf oil from obligors under the LPA and directed that such oil be delivered directly to HIPCO's customers. Tax matters are decided on the basis of substance, and the bottom line in this case is HIPCO purchased backup Persian Gulf crude oil and sold it in the international crude oil market.

*British Timken Ltd. v. Commissioner*, 12 T.C. 880 (1949), relied upon by petitioners, does not lead to a contrary result. There, the taxpayer, a foreign corporation, was not engaged in a trade or business within the United States. Its business involved the manufacture and sale of roller bearings solely in Great Britain. Because of the outbreak of World War II, the taxpayer was prevented from filling its customers' orders; and consequently, a system was arranged whereby a related U.S. company supplied roller bearings directly to the taxpayer's customers. The income to be sourced was commissions computed with reference to the amount of the sales. Despite the fact that title to the personal property was transferred within the United States,

---

[29]See, e.g., *Helvering v. Stein*, 115 F.2d 468 (4th Cir. 1940), affg. 40 B.T.A. 848 (1939) (court found the substance of the transaction was a loan since the property sold was not purchased, and on that basis sourced the income as interest.)

we concluded that the commission income was sourced in Great Britain. In reaching that conclusion we stated:

Where the income of a taxpayer is derived from the sale of personal property, the situs of the sale and the "source" of the income attributable to the sale is the place where the seller surrenders all his right, title, and interest to the buyer. * * *

* * * But we do not regard the fact that the situs of the sales was within the United States as determinative of the source of petitioner's income. Although a manufacturer's profits may be the direct result of the production and sale of its products, it does not follow that such sales constitute the source of the income of many persons associated with the sales such as its salesmen, buyers, agents, and officers whose earnings are attributable to other considerations such as their sales ability or technical knowledge. This is true even though the compensation received may be measured by the amount of sales. It is the situs of the activity or property which constitutes the source of the compensation paid and not the situs of the sales by which it is measured that is of critical importance. * * *

[12 T.C. at 886-887.]

Petitioners submit that we are bound by our approach in *British Timken* and must either reject the title passage rule of section 1.861-7, Income Tax Regs., or overrule *British Timken.* We disagree because the income to be sourced in *British Timken* was sales commissions and not income measured by the profit margin on sales, and for that reason, the case is factually distinguishable from the case before us. In addition, *British Timken* was decided prior to January 1, 1957, the date regulations promulgated under sections 861 through 863, became generally effective. See T.D. 6258, 1957-2 C.B. 368. We conclude, therefore, that petitioners' reliance on *British Timken* is misplaced.

Petitioners next contend that if the disputed transactions are characterized as purchases and sales of backup crude, HIPCO's income arose upon the receipt of the crude entitlements and should be taxed as bargain purchases. This argument lacks both factual and legal support and must be viewed as an attempt to avoid sourcing the income under the title passage rule.

The general rule is that the purchase of property from an unrelated party for less than its value does not, of itself, give rise to the realization of taxable income. Such income normally arises, and is taxed, upon the sale or other disposition of the property. *Palmer v. Commissioner,* 302

U.S. 63 (1937); *Pellar v. Commissioner*, 25 T.C. 299, 309 (1955). There are instances, of course, where a bargain purchase may give rise to taxable income at the point of acquisition because of the relationship between the parties or for some other reason, but petitioners have presented no basis for departing from the general rule here.

In fact, HIPCO's business records clearly show that the income from its transactions in backup crude was calculated by reference to HIPCO's cost and the amount paid for the oil by its customers. Moreover, at trial petitioners offered no evidence regarding the fair market value of the backup crude entitlements upon their receipt, or any reason if this were the point of income, why HIPCO expended the time and effort to fulfill its sales contracts with customers by nominating the deliveries of oil to them. On this record we find that the earning point of income in both time and place occurred upon the sale of the crude to HIPCO's customers. We have found that this point was the port in the Persian Gulf at which HIPCO's customer elected to accept delivery of the crude oil.

We are urged to view petitioners' transactions in backup crude as a substitute for production and marketing of Libyan oil which HIPCO would have extracted in the absence of the adverse activity of Libya. Petitioners contend, therefore, that the backup crude was derived at least indirectly from HIPCO's ownership of Libyan wells and should be sourced in Libya under section 1.863-1(b), Income Tax Regs., which provides that income derived from the sale of products from an oil or gas well located within a particular country is ordinarily to be sourced in that country.[30] Therefore, this argument by petitioners has initial appeal; but fails to consider the fact that during the periods in dispute, HIPCO had no production of oil in Libya.

---

[30]Sec. 1.863-1, Income Tax Regs., in pertinent part states:

Allocation of gross income under section 863(a).

(a) *General.* Items of gross income other than those specified in section 861(a) (sections 1.861-2 to 1.861-7, inclusive) and section 862(a) (section 1.862-1) shall be allocated or apportioned to sources within or without the United States, as provided in section 863(a) * * *

(b) *Natural Resources.* (1) The income derived from the ownership or operation of any farm, mine, oil or gas well, other natural deposits, or timber, located within the United States and *from the sale* by the producer of the products thereof within or without the United States, shall ordinarily be included in gross income from sources within the United States. * * * [Emphasis supplied.]

In fact, HIPCO's wells were held and operated by the Libyan Government throughout 1974, and we cannot overlook the fact that the crude oil sold by HIPCO was produced by other companies from wells located in Persian Gulf nations and was lifted by HIPCO's customers from ports located within such nations. Therefore, the income at issue in this case has no connection with HIPCO's exploitation of natural deposits located in Libya and was not derived from HIPCO's ownership or operation of oil wells located in Libya. Consequently, section 1.863-1(b), Income Tax Regs., is not applicable.

The above argument by petitioners also ignores the fact that in the enactment of sections 901 through 905 Congress was concerned with double taxation. See *AMP, Inc. v. United States*, 492 F. Supp. 27, 31 (M.D. Pa. 1979). These sections were enacted therefore to ensure that income subject to tax both in the United States and in a foreign country was taxed at no more than the higher rate applicable in either the United States or the foreign country. See *American Chicle Co. v. United States*, 316 U.S. 450, 451 (1942) (construing predecessor statutes); *Anderson, Clayton & Co. v. United States*, 562 F.2d 972, 978 (5th Cir. 1977). The limitation in section 904(a) was inserted to protect the domestic revenue in situations where the foreign tax rate was higher. H. Rept. 708, 72d Cong., 1st Sess. (1932), 1939-1 C.B. (Part 2) 473; *F.W. Woolworth Co. v. Commissioner*, 54 T.C. 1233, 1264 (1970); see also *Federated Mut. Implement & Hardware Ins. Co. v. Commissioner*, 266 F.2d 66 (8th Cir. 1959), affg. 29 T.C. 262 (1957); *Omega Chemical Co. v. Commissioner*, 31 B.T.A. 1108 (1935).

In this case, we are urged by petitioners to source the income from the backup crude in Libya in spite of the fact that the income had no connection with Libya and was never subject to tax in that country.

Furthermore, a finding that the income from the Persian Gulf crude was sourced in Libya in this case would convert petitioners' per-country limitation in 1974 under section 904(a)(1) to an overall limitation under section 904(a)(2). Ordinarily that would not pose a dilemma but in this case the foreign taxes to be credited are a carryover from 1973, a per-country limitation year, and section 904(d) does not

permit unused foreign taxes in a per-country limitation year to be carried over as a credit in an overall limitation year.[31]

Petitioners also request that we source HIPCO's income from the backup crude in Libya as income in the nature of insurance proceeds or as compensation for personal services. The record, however, makes it abundantly clear that such income is not insurance proceeds nor can we view it as compensation for personal services.

While the LPA has some characteristics of a risk-sharing arrangement, HIPCO's transactions with respect to the backup crude have all the characteristics of purchases and sales, and the income derived by HIPCO therefrom has all the characteristics of the profits received from the sales of

---

[31]Sec. 904(d) provides:

SEC. 904(d). CARRYBACK AND CARRYOVER OF EXCESS TAX PAID.—Any amount by which any such tax paid or accrued to any foreign country or possession of the United States for any taxable year beginning after December 31, 1957, for which the taxpayer chooses to have the benefits of this subpart exceeds the applicable limitation under subsection (a) shall be deemed tax paid or accrued to such foreign country or possession of the United States in the second preceding taxable year, in the first preceding taxable year, and in the first, second, third, fourth, or fifth succeeding taxable years, in that order and to the extent not deemed tax paid or accrued in a prior taxable year, in the amount by which the applicable limitation under subsection (a) for such preceding or succeeding taxable year exceeds the sum of the tax paid or accrued to such foreign country or possession for such preceding or succeeding taxable year and the amount of the tax for any taxable year earlier than the current taxable year which shall be deemed to have been paid or accrued in such preceding or subsequent taxable year (whether or not the taxpayer chooses to have the benefits of this subpart with respect to such earlier taxable year). Such amount deemed paid or accrued in any year may be availed of only as a tax credit and not as a deduction and only if taxpayer for such year chooses to have the benefits of this subpart as to taxes paid or accrued for that year to foreign countries or possessions. For purposes of this subsection, the terms "second preceding taxable year" and "first preceding taxable year" do not include any taxable year beginning before January 1, 1958.

See also S. Rept. 1393, 86th Cong., 2d Sess. (1960), 1960-2 C.B. 874, 877, for the following comments made in the report of the Committee on Finance on Pub. L. 86-780 which, in 1960, added the overall limitation on the foreign tax credit:

"Like the House bill, the bill as amended by your committee does not permit foreign taxes to be carried from an overall-limitation year to a per-country-limitation year. In addition, however, your committee's bill does not permit foreign taxes to be carried from a per-country-limitation year to an overall-limitation year. This restriction was added because otherwise there would be a windfall gain to those taxpayers who have accumulated unused carryovers, which they could not use when the per-country-limitation was applicable, and which they might now be able to use if they shift over to the overall limitation. In many cases the greater averaging obtainable under the overall limitation would enable taxpayers to use these accumulated unused foreign taxes as credits when they otherwise could not do so. The Treasury Department has estimated that this aspect of the bill alone would have resulted in an immediate revenue loss for the first year after enactment of approximately $30 million. Your committee's amendments foreclose this windfall and possible revenue loss by permitting unused foreign taxes to be carried only from a year in which the per-country-limitation applies to another year in which this same limitation applies or from a year in which the overall limitation applies to another year in which this same limitation applies."

oil over the cost of the oil sold. Equally without merit is petitioners' argument that the oil entitlements constitute compensation by other signatories to the LPA for HIPCO's activities in Libya. However, the right of HIPCO to purchase oil under the LPA was triggered by Libyan cutbacks in production. Nothing in the record before us tends to connect the triggering event to any services performed or any "actions taken or refrained from by HIPCO" in Libya. In any event, we are satisfied that to the extent activities were performed by HIPCO in Libya, they were undertaken solely for HIPCO's benefit. See *Bank of America v. United States,* 230 Ct. Cl. 679, 680 F.2d 142 (1982).

Finally, petitioners submit that HIPCO's income from its transactions in backup crude should be consistent with the stipulation by the parties that the dimes received by HIPCO were properly sourced in Libya. While we agree that consistency is a laudable goal in our consideration of the issue before us, i.e., the source of the income from the backup crude, we must look to the facts in the record and not to stipulations reached by the parties on other issues.[32]

A bevy of other arguments have been made by petitioners. We have considered each contention, but remain convinced that the title passage rule is the appropriate method of sourcing the income from petitioners' sales of backup Persian Gulf crude. We are also satisfied that the result we reach is in accord with the purposes of both the foreign tax credit and the limitation upon the credit as gleaned from legislative history and the case law construing the foreign tax credit provisions.

In view of the foregoing, we conclude that the source of HIPCO's income from its transactions in the backup Persian Gulf crude oil received from other signatories to the LPA was not Libya for the purpose of calculating the foreign tax credit of petitioners under section 901.

---

[32]We have also noted petitioners' complaint that the application of the title passage rule leads to a result which is artificial and inconsistent with the fact that HIPCO did not have any production in Persian Gulf nations. However, HIPCO's sales were consummated in the Persian Gulf nations since that was the point at which its customers received right, title, and interest to the back-up crude oil. It would be even more inconsistent and artificial to source the disputed income in Libya, a country in which HIPCO had neither production nor sales activities pertaining to the crude oil during the period at issue.

Due to concessions,

*Decisions will be entered under Rule 155.*