**BANK OF AMERICA, an Edge Act corporation,**

v.

**The UNITED STATES.**

No. 402–71.

United States Court of Claims.

June 2, 1982.

18. Defendant's motion to strike the affidavit of Harold F. Olsen is denied.

Stephen J. Swift, San Francisco, Cal., atty. of record, for plaintiff; Charles R. Conradi, San Francisco, Cal., of counsel.

Kenneth R. Boiarsky, with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D. C., for defendant; Theodore D. Peyser and Donald H. Olson, Washington, D. C., of counsel.

Before DAVIS, KASHIWA and SMITH, Judges.

OPINION

KASHIWA, Judge:

This case is before the court on the defendant's exceptions to the findings of fact and recommended opinion of Trial Judge John P. Wiese. We are faced with the question whether certain commissions received by the plaintiff, Bank of America, an Edge Act corporation, should be characterized as United States or foreign source income for purposes of the Internal Revenue Code. The trial judge held that all the commissions at issue should be classified as income from sources without the United States. We have given careful consideration to the trial judge's report, the parties' submissions, and oral argument. We find that although we agree with the result reached by the trial judge as to acceptance and confirmation commissions, our reasoning differs. With regard to negotiation commissions, we reverse the trial judge and hold such commissions are income from sources within the United States.

I.

Plaintiff is an Edge Act corporation organized and existing under the laws of the United States, 12 U.S.C. §§ 611–614 (1976).[1] The Edge Act amended the Federal Reserve Act in 1919 to allow national banks to participate in international banking through qualified subsidiaries. These subsidiaries, such as plaintiff, are domestically organized corporations which are permitted to offer international banking services. As an Edge Act corporation, plaintiff is only permitted to transact international business and therefore is actively involved in financing of international trade. The financing of international trade often occurs through the issuance of short-term loans, confirmed letters of credit, and the issuance of banker's acceptances. We are concerned here with the commissions charged by the plaintiff for confirmed letters of credit, banker's acceptances, and negotiations in connection with export letters of credit. These commissions were paid to the plaintiff in the years 1958 through 1960 by foreign banks located in Germany, France, Guatemala, and Singapore.

The transactions at issue involve commercial letters of credit issued by a foreign

---

[1] Some of the facts are disputed by the parties. We have made all necessary findings of fact within the text of this opinion.

bank on behalf of a foreign purchaser for the benefit of an American exporter. Such a transaction begins with an agreement by an American exporter to sell goods to a foreign purchaser. The foreign purchaser then requests a commercial letter of credit from a foreign bank. A commercial letter of credit is a mechanism whereby trade is facilitated; it is a document issued by a bank on behalf of its customer. This document commits the bank to pay the beneficiary of the letter when certain terms have been met. By issuing a letter of credit, a bank has substituted its credit for that of its customer. The bank issuing the letter of credit is commonly referred to as the opening bank. An opening bank will only issue a letter of credit when it has evaluated its customer's credit and found it satisfactory. Thus, the foreign bank issues the letter of credit for the benefit of the American seller if it finds the foreign purchaser creditworthy. The terms of such a letter typically include some of the terms of the sales agreement between the merchants. By issuing such a letter of credit, the foreign opening bank agrees to pay the American seller a specified amount when the American seller meets the terms of the letter of credit. The foreign opening bank, in turn, expects its customer, the foreign importer, to reimburse it.

The letter of credit the opening bank issues may be one of two different types known as sight and usance (or time) letters of credit. The beneficiary of a sight letter of credit is entitled to payment once it is determined he has met the terms of the letter. The beneficiary of a usance letter of credit, on the other hand, is not entitled to payment immediately upon the determination he has met the terms of the letter but, instead, will be entitled to payment at a specified time in the future. Plaintiff's transactions in the years in question involve both sight and usance letters of credit. A draft is the specific document that directs payment be made to the beneficiary. There are both sight and time drafts.

Any letter of credit a foreign bank issues on behalf of a foreign purchaser for the benefit of an American exporter can be *advised* by the plaintiff as a courtesy to the foreign bank. When a letter of credit is advised by the plaintiff, plaintiff simply informs the American beneficiary of the letter that a letter of credit has been issued in his favor and forwards the letter. The plaintiff does not undertake any credit commitment and so informs the letter's beneficiary. Uniform Customs & Practice for Commercial Documentary Credits Fixed by the Thirteenth Congress of the International Chamber of Commerce, Article 6 (effective January 1, 1952) (hereinafter UCP).[2] *See generally* U.C.C. § 5–103. During the years 1958 through 1960, no fee was charged by the plaintiff for advisement.

Alternatively, a foreign bank can request that plaintiff *confirm* a sight letter of credit. If plaintiff agrees to confirm a sight letter of credit, it not only advises the letter but it irrevocably commits itself to pay the face amount of the letter. Payment is only made if the beneficiary has met the terms of the letter of credit. UCP, Article 5. Under ordinary circumstances, plaintiff is reimbursed by the foreign bank for paying the draft. Whether or not plaintiff agrees to confirm a letter of credit depends upon its evaluation and credit analysis of the opening bank. When plaintiff does agree to confirm, it notifies the beneficiary. At the time of notification, plaintiff becomes obligated to pay the beneficiary regardless of any changes that might take place affecting the ability of the opening bank to reimburse the plaintiff. Subsequent to notification, a beneficiary can present the letter of credit and supporting documents for payment at any time.

After plaintiff has paid the amount of the draft to the beneficiary, it will ordinarily debit the foreign bank's account. Occasionally, a foreign bank will prepay the amount of the draft. When prepayment occurs, plaintiff usually waives the confirmation commissions. During the years 1958 through 1960, plaintiff charged the opening

---

**2.** During the years 1958 through 1960, letters of    credit were governed by the UCP.

foreign bank a commission for confirmation of ¹⁄₂₀ of 1 percent of the face amount of the draft for each calendar quarter or fraction thereof the draft was outstanding. If this amount was less than $2.50, a minimum commission of $2.50 was charged. Confirmation commissions are charged the opening bank upon confirmation.

A foreign bank can also request that plaintiff *negotiate* a letter of credit. This can be done with either advised or confirmed letters of credit. Negotiation is the process by which the beneficiary's papers are checked to see whether they meet the terms of the letter of credit. This process takes place at the offices of the plaintiff in the United States. The papers are then forwarded to the opening bank which independently checks the papers. Neither bank inspects the merchandise. In cases involving confirmed letters of credit, negotiation is always required. A separate commission was charged for negotiation of ¹⁄₁₀ of 1 percent of the face amount of the draft. If this amount was less than $5, a minimum of $5 was charged. With confirmed letters of credit, the negotiation commission is charged at the time the sight draft is honored.

The third type of commission we are concerned with is *acceptance* commissions. Acceptance financing can be used to obtain money directly, to finance the storage of goods, to refinance sight letters of credit, and to finance export/import trade. The acceptance commissions involved in this case were paid to plaintiff by foreign banks as a result of plaintiff's acceptance of time drafts drawn pursuant to usance letters of credit issued by those foreign banks or pursuant to lines of credit extended by plaintiff to the foreign banks. When a foreign bank requests plaintiff's involvement in acceptance, plaintiff first undertakes a credit analysis of the foreign bank. If plaintiff agrees, the following procedures take place.

In circumstances involving usance letters of credit, when the beneficiary presents the letter of credit and accompanying documents to the plaintiff, plaintiff examines the documents to see whether they conform to the terms of the letter of credit. If the documents conform, plaintiff places its acceptance stamp upon the draft. By placing its stamp upon the draft, plaintiff obligates itself to pay the face amount of the draft on the day the draft becomes due. Once the plaintiff's acceptance is stamped, the draft becomes a money market obligation and is freely tradeable. Plaintiff is obligated to pay any holder in due course on the date the draft becomes due.

Customarily, the foreign bank pays the plaintiff the face amount of the time draft on the day preceding the date of its maturity. This normally is done by debiting the account of the foreign bank. Whether or not the foreign bank makes the payment, plaintiff is obligated to pay the holder in due course of the draft. The acceptance commission charged by the plaintiff would vary from 1.5 percent to 2.5 percent per year of the face amount of the draft, depending upon the creditworthiness of the foreign bank.

In circumstances involving lines of credit, these lines of credit are first established by plaintiff for its customer, the foreign bank, after a thorough credit evaluation is conducted by the plaintiff. Typically, such lines of credit provide a ceiling dollar amount for direct loans, letters of credit, and banker's acceptances. A foreign bank with such a line of credit can ask the plaintiff to refinance a letter of credit. In that situation, the foreign bank requests plaintiff provide financing in the form of a draft of a sufficient amount to reimburse the plaintiff for its payment of the original letter of credit. The present discounted value of this draft is equivalent to the face amount of the original draft. Plaintiff then accepts the newly issued draft. Upon its acceptance, the draft is immediately discounted and the proceeds used to reimburse the plaintiff for payment of the original draft. Under this type of financing, the foreign bank pays the plaintiff the same acceptance commissions it pays in acceptance transactions involving usance letters of credit. The foreign bank also pays the plaintiff the amount of the discount. The

commission and the discount together approximate the interest charge the foreign bank would have paid if it had obtained a direct loan.

For the years 1958 through 1960, plaintiff paid income taxes on its international banking business to Germany, France, Guatemala, and Singapore. In its timely filed United States income tax return for the same years, plaintiff deducted foreign income taxes under 26 U.S.C. (Internal Revenue Code of 1954 as amended) § 164 (subsequent section references are to the Internal Revenue Code). In May 1963, plaintiff timely filed claims for refund for federal income taxes assertedly overpaid by it for its 1958 through 1960 taxable years. These claims were amended in June 1966. In its refund claims, plaintiff elected to take a foreign tax credit under section 901, rather than a deduction under section 164, for the foreign taxes it paid or accrued. In computing the per-country foreign tax credit limitation of section 904 for income taxes paid to Germany, France, Guatemala, and Singapore, plaintiff treated the confirmation, negotiation, and acceptance commissions it received from foreign banks in those countries as income from sources without the United States. The Internal Revenue Service partially disallowed plaintiff's refund claim. It determined the commissions in question were income from sources within the United States for purposes of computing the limitation under section 904. On May 11, 1971, plaintiff timely instituted this federal income tax refund suit. We must decide whether the confirmation, negotiation, and acceptance commissions at issue are United States or foreign source.

## II.

Plaintiff as a domestic corporation is taxed on its worldwide income. Sections 11, 61; *Great-West Life Assurance Co. v. United States*, Ct.Cl., 678 F.2d 180 at 183 (1982). Under section 901, plaintiff receives a foreign tax credit for taxes it has paid on its income to foreign countries. The calculation of this credit is limited by section 904. During the years at issue, section 904 provided in pertinent part:

SEC. 904. LIMITATION ON CREDIT.

(a) *Limitation.*—The amount of the credit in respect of the tax paid or accrued to any country shall not exceed the same proportion of the tax against which such credit is taken which *the taxpayer's taxable income from sources within such country* (but not in excess of the taxpayer's entire taxable income) *bears to his entire taxable income* for the same taxable year. [Emphasis supplied.[3]]

Thus before plaintiff's foreign tax credit can be calculated, it must be determined whether the commissions at issue are United States or foreign source income.

Sections 861, 862, and 863 provide rules for determining whether a particular class of income is United States or foreign source. Sections 861(a)(1) through (a)(7) provide rules as to when specific classes of income are sourced within the United States.[4] Section 862(a) is a parallel section providing when those same classes of income are sourced without the United States. The classes of income specified in sections 861 and 862 include the following: interest, dividends, personal services, rentals and royalties, income derived from the disposition of real property, income from the sale or exchange of personal property, and underwriting income. Section 863 grants the Secretary authority to promulgate regulations allocating income not specified within sections 861(a) and 862(a) to sources within and without the United

---

**3.** During the taxable years 1958 through 1960, section 904 provided for only a per-country limitation. For taxable years subsequent to 1960, section 904 allowed an election of an overall limitation. For taxable years beginning after December 31, 1975, section 904 now pro-vides for an overall limitation and no longer allows the per-country limitation.

**4.** Sections 861(a)(7) and 862(a)(7), which provide for the sourcing of underwriting income, were added subsequent to the years at issue here.

States.[5] It is well settled that sections 861 through 863 and their predecessors were not intended to be all inclusive. *Helvering v. Suffolk Co.*, 104 F.2d 505 (4th Cir. 1939); *Welsh Trust v. Commissioner*, 16 T.C. 1398 (1951); *De Stuers v. Commissioner*, 26 B.T.A. 201 (1932). When an item of income is not classified within the confines of the statutory scheme nor by regulation, courts have sourced the item by comparison and analogy with classes of income specified within the statutes. *E.g., Howkins v. Commissioner*, 49 T.C. 689 (1968).

■ The parties agree that to determine what class of income the commissions fall within or may be analogized to we must look to the substance of the transaction. *Karrer v. United States*, 138 Ct.Cl. 385, 152 F.Supp. 66 (1957). The Government takes the position that plaintiff is paid by the opening banks for services. If so, personal services are sourced under sections 861(a)(3) and 862(a)(3) where those services are performed.[6] The Government contends the plaintiff performed the services relevant to the commissions at its offices in the United States.[7] Thus, under the Government's theory the commissions are sourced as income from United States sources. The plaintiff, on the other hand, contends it is not being paid for personal services but instead for something similar to a loan (the use of its credit). Thus, plaintiff claims its income may be sourced by analogy to interest. Interest under sections 861(a)(1) and 862(a)(1) is in general sourced by the residence of the obligor.[8] *Standard Marine Insurance Co. v.*

---

**5.** The regulations promulgated to date have dealt only with income derived from natural resources, transportation services, and telegraph and cable communication services. Treas.Reg. §§ 1.863–1, 1.863–4, 1.863–5.

**6.** Section 861(a)(3) provided during the years 1958 through 1960:

"SEC. 861. INCOME FROM SOURCES WITHIN THE UNITED STATES.

"(a) *Gross Income From Sources Within United States.*—The following items of gross income shall be treated as income from sources within the United States:

    *       *       *       *       *       *

"(3) *Personal Services.*—Compensation for labor or personal services performed in the United States; except that compensation for labor or services performed in the United States shall not be deemed to be income from sources within the United States if—

"(A) the labor or services are performed by a nonresident alien individual temporarily present in the United States for a period or periods not exceeding a total of 90 days during the taxable year,

"(B) such compensation does not exceed $3,000 in the aggregate, and

"(C) the compensation is for labor or services performed as an employee of or under a contract with—

"(i) a nonresident alien, foreign partnership, or foreign corporation, not engaged in trade or business with the United States, or

"(ii) a domestic corporation, if such labor or services are performed for an office or place of business maintained in a foreign country or in a possession of the United States by such corporation."

Section 862(a)(3) provided:

"SEC. 862. INCOME FROM SOURCES WITHOUT THE UNITED STATES.

"(a) *Gross Income From Sources Without United States.*—The following items of gross income shall be treated as income from sources without the United States:

    *       *       *       *       *       *

"(3) compensation for labor or personal services performed without the United States;"

**7.** The plaintiff argues that application of the source of income rules for personal services would lead to uncertainty. It says it is for this reason it has not attempted for the years in issue to identify and quantify the personal services which may have been performed overseas.

**8.** Section 861(a)(1) provided during the years 1958 through 1960:

"SEC. 861. INCOME FROM SOURCES WITHIN THE UNITED STATES.

"(a) *Gross Income From Sources Within United States.*—The following items of gross income shall be treated as income from sources within the United States:

"(1) *Interest.*—Interest from the United States, any Territory, any political subdivision of a Territory, or the District of Columbia, and interest on bonds, notes, or other interest-bearing obligations of residents, corporate or otherwise, not including—

"(A) interest on deposits with persons carrying on the banking business paid to persons not engaged in business within the United States,

"(B) interest received from a resident alien individual, a resident foreign corporation, or a domestic corporation, when it is shown to the satisfaction of the Secretary or his delegate that less than 20 percent of the gross income of such resident payor or domestic corporation has been derived from sources within the United States, as determined under the provisions

*Commissioner,* 4 B.T.A. 853 (1926); Treas. Reg. § 1.861–2(a)(3). Since the commissions in this case were paid by foreign banks, the plaintiff takes the position the income is foreign source. The trial judge found neither the plaintiff's nor the Government's analysis adequate. He found the substance of the transaction to be the plaintiff's promise to pay regardless of any change in circumstances, *i.e.,* the assumption of risk of the foreign bank's default. Since the foreign bank and the risks associated with it are located abroad, the trial judge found the commissions to be foreign source.

We do not fully agree with any single analysis proposed. Instead, to properly determine the source of the various commissions, we hold that each type of commission must be examined separately.

### III.

■ We first consider acceptance commissions. As we have explained, the acceptance commissions at issue are paid by foreign banks to the plaintiff under two circumstances. The first is as a result of plaintiff's acceptance of time drafts drawn pursuant to usance letters of credit; the second is as a result of the acceptance of drafts drawn against a line of credit extended by plaintiff to the foreign bank. In either circumstance what occurs is similar to a loan transaction. In a direct loan a lender uses its credit resources to intermediate between investors who have money available and borrowers who need money. With direct loans a lender will assume the credit risk of the borrowers to its investors. Similarly, in the acceptance financing transactions at issue the plaintiff acts as an intermediate between the holder of the acceptance draft and the foreign bank. The

plaintiff assumes the credit risk of the foreign bank and assures the draft's holder of its payment. The plaintiff on the day it accepts a time draft guarantees to the holder that it will pay the full amount of the draft at maturity at a specified date in the future. This promise is made regardless of any change in circumstances that may cause the foreign bank to default. The significance of the plaintiff's guarantee is evidenced by the fact the accepted draft is freely tradeable on the market. In *Helvering v. Stein,* 115 F.2d 468 (4th Cir. 1940), an income tax case that also involved a sourcing issue, the Fourth Circuit treated a transaction involving banker's acceptances as a loan transaction. The court said, "[we] do not think the use of drafts instead of promissory notes in these transactions goes beyond the form of the transaction." *Id.* at 472. Similarly, we find the use of banker's acceptances in the transactions at issue cannot mask their essence. The essence of the transactions, like that of a direct loan, is the use of plaintiff's credit.

The commissions charged the foreign banks by the plaintiff include elements covered by the interest charges made on direct loans. The evidence established that interest typically covers credit risk, credit administration, and cost of funds. *See Noteman v. Welch,* 108 F.2d 206 (1st Cir. 1939). If we examine an acceptance financing transaction, we find the commissions charged cover credit risk and credit administration. A holder of an accepted draft may present his draft for payment or trade it on the market at any time. If he does so prior to maturity, he will receive not the value of the draft at maturity but its discounted value. The discounted value is equivalent to the value at maturity *less* the

of this part, for the 3-year period ending with the close of the taxable year of such payor preceding the payment of such interest, or for such part of such period as may be applicable, and

"(C) income derived by a foreign central bank of issue from bankers' acceptances." Section 862(a)(1) provided:

"SEC. 862. INCOME FROM SOURCES WITHOUT THE UNITED STATES.

"(a) *Gross Income From Sources Without United States.*—The following items of gross income shall be treated as income from sources without the United States:

"(1) interest other than that derived from sources within the United States as provided in section 861(a)(1);"

time value of the money (cost of funds). Typically, the discount plus the acceptance commission will approximate interest charges made on direct loans. It is thus apparent that acceptance commissions cover the cost to the plaintiff of credit administration and credit risk. This notion is reinforced by the fact plaintiff varied its acceptance commissions from 1.5 percent to 2.5 percent dependent upon the creditworthiness of its customer. *Cf. Sumitomo Bank, Ltd. v. Commissioner*, 19 B.T.A. 480 (1930) (compensation received by a Japanese bank with a New York agency on transactions involving banker's acceptances was treated as interest).

We recognize the plaintiff performed services for the foreign banks as part of the acceptance transactions; *e.g.*, advising the letter of credit and making the actual payment of money. We also realize foreign banks without United States branches cannot perform some of these services and require an agent in the United States to do that. We find, however, these functions are not the predominant feature of the transactions. Instead, the predominant feature of these transactions is the substitution of plaintiff's credit for that of the foreign banks. No one would question that lenders in making direct loans also perform personal services. Yet, Congress in section 861(a)(1) and 862(a)(1) has determined that all interest will be sourced under those sections and not as personal services under sections 861(a)(3) and 862(a)(3). We find acceptance commissions to be similar.

In *Block v. Pennsylvania Exchange Bank*, 253 N.Y. 227, 230–231, 170 N.E. 900, 901 (1930), then Chief Judge Cardozo said:

> * * * "The central function of a commercial bank is to substitute its own credit, which has general acceptance in the business community for the individual's credit, which has only limited acceptability." * * * A bank "manufactures credit by accepting the business paper of its customers as security in exchange for its own bank credit in the form of a deposit account." * * * "It stands ready to exchange its own credits for those of its

customers." * * * Whatever is an appropriate and usual incident to this substitution or exchange of credits, instead of being foreign to the functions and activities of banking, is in truth of their very essence. It is the end for which a bank exists. [Citations omitted.]

We therefore hold that for the reasons discussed the acceptance commissions are sourced by analogy to interest under the provisions of sections 861(a)(1) and 862(a)(1). Interest should be used because it furnishes the closest analogy in the statutory sourcing provisions, although (as the trial judge held) the acceptance commissions here cannot be directly equated with interest. Since interest is sourced by the residence of the obligor and the obligors in all instances were foreign banks, we find the acceptance commissions are foreign source income.

### IV.

■ We next consider confirmation commissions. In confirmation the plaintiff advises a sight letter of credit *and* adds to it its own obligation to pay the sight draft when the terms of the letter have been met. The plaintiff irrevocably commits itself to pay the draft at the time it notifies the beneficiary of the letter of credit that it has confirmed the letter. The beneficiary may present the letter and accompanying document to the plaintiff for payment at any time thereafter. The account of the foreign bank is ordinarily not debited until the sight draft is presented and paid. Thus, from the moment of confirmation the plaintiff has made an enforceable promise to pay regardless of any change in the foreign bank's financial condition. As in acceptance and loan transactions, the plaintiff here has acted as an intermediate, has assumed the risk of default of the foreign bank, and has assured the draft's holder of payment.

The services involved in confirmation are little different from those in advisement where *no charge* is made. The only service provided by plaintiff in confirmation that was not provided in advisement is the actual payment of dollars. It is important to

note the plaintiff usually waived the confirmation commissions when a foreign bank prepaid the amount of the draft. Thus, it is apparent what plaintiff was really charging for was not the services performed but the substitution of its own credit for that of the foreign bank. The predominant feature of the confirmation transactions was the substitution of plaintiff's credit for that of the foreign banks. The services performed were subsidiary to this. Therefore due to the similarities between a confirmation and a loan transaction, we hold that the confirmation commissions should be sourced by analogy to interest. Again we point out that interest should be used because it furnishes the closest analogy in the statutory sourcing provisions, although confirmation commissions cannot be directly equated with interest. Since the obligors were all foreign banks, we hold the confirmation commissions are income from without the United States.

### V.

■ Finally, we consider negotiation commissions. The analysis here is somewhat different. Negotiation is simply the process by which the plaintiff checks to see whether the documents the beneficiary presents conform to the terms of the letter of credit. A separate commission is charged for negotiation of advised letters of credit and confirmed letters of credit. Where negotiation commissions are charged for advised letters of credit, we find the commissions are charged for personal services.[9] In those situations there is no assumption of any credit risk by the plaintiff. The plaintiff does not make any payments to the beneficiary of the letter of credit. The only risk present is that the plaintiff will improperly check the documents. No analogy can possibly be drawn to a loan situation. Since the negotiation commissions charged with advised letters of credit are clearly being charged for personal services, we hold they should be sourced as personal services.

Plaintiff contends, however, in instances where letters of credit are confirmed it must negotiate to protect itself from making payment to a party who has not met the terms of the letter of credit. Plaintiff therefore argues the risks of the confirmation process are dominant and should control the sourcing of the negotiation commissions. Although we agree plaintiff requires negotiation with confirmed letters of credit, we cannot agree the character of confirmation controls that of negotiation. Plaintiff's own method of structuring these transactions militates against its argument. Plaintiff does not charge just one fee for confirmation and negotiation but makes two separate charges at two separate points in time. It charges negotiation commissions when it completes the actual negotiation process. In addition, the negotiation commissions are twice that of confirmation commissions. We therefore cannot conclude the services of negotiation are so minor they are merely a part of the confirmation process.[10] When a foreign bank pays the plaintiff a commission for negotiation, it is paying the plaintiff to perform the physical process of checking documents and nothing more.

We therefore hold negotiation is a personal service and negotiation commissions are therefore sourced under sections 861(a)(3) and 862(a)(3). Personal services are sourced where the services are performed. Plaintiff performed negotiation at its offices in the United States. Thus, negotiation commissions are income from sources within the United States.

### VI.

In conclusion, we hold the acceptance and confirmation commissions at issue are in-

---

**9.** Approximately 10 percent of the negotiation commissions at issue involved advised letters of credit.

**10.** Negotiation is part of the acceptance process but no separate charge is made for it. A comparison of the charges made for acceptance (1.5 to 2.5 percent) with the separate charge for negotiation made in other circumstances (1/10 of 1 percent) demonstrates negotiation is a minor portion of the acceptance process. It shows the inclusion of negotiation does not change the basic nature of the acceptance process, that being the use of plaintiff's credit.

come from sources without the United States and the negotiation commissions are income from sources within the United States. We remand the case to a trial judge under Rule 131(c) to determine in light of our holding the foreign tax credit and refund plaintiff shall receive for the taxable years 1958 through 1960.