CONTAINER CORPORATION, SUCCESSOR TO INTEREST OF CONTAINER HOLDINGS CORPORATION, SUCCESSOR TO INTEREST OF VITRO INTERNATIONAL CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3607–05.        Filed February 17, 2010.

Vitro, a Mexican corporation, charged P—one of its U.S. subsidiaries—a fee to guarantee P's debts. R determined a deficiency for failure to withhold 30 percent of such fees as "fixed or determinable annual or periodical" income received from a U.S. source under section 881(a), I.R.C. *Held*: The guaranty fees are analogous to payments for a service and therefore are not U.S. source income. Under sec. 1.861–4,

> Income Tax Regs., the source of the service is where the service is performed. Because the guaranty was provided from Mexico, fees for the guaranty are Mexican source income. Thus, P didn't need to withhold 30 percent of the guaranty fees under section 881(a), I.R.C.

*Emily A. Parker*, for petitioner.
*Dennis M. Kelly*, for respondent.

## OPINION

HOLMES, *Judge*: The Code puts a 30-percent tax on "fixed or determinable annual or periodical" income received by foreign corporations from sources within the United States. Vitro, S.A. is a Mexican corporation that charged one of its U.S. subsidiaries a fee to guarantee the subsidiary's debt to U.S. lenders. The question presented in this case is whether that fee is from a source within the United States.

### *Background*

In 1901, Vitro, S.A. started making glass bottles for the local beer makers of Monterrey, Mexico. Over the next century, Vitro became one of Mexico's most successful businesses, eventually becoming a holding company and the corporate parent of a large number of consolidated and unconsolidated subsidiaries. These subsidiaries manufacture and market a wide range of products, including just about everything made from glass. Vitro provides administrative and support services to its Mexican operating subsidiaries through a wholly owned management subsidiary, Vitro Corporativo, S.A. (Corporativo).

This case involves Vitro's glass containers division. The glass container business is driven by economies of scale—greater production equals greater profits. And, in the late 1980s, Vitro—already Mexico's largest manufacturer of glass containers—decided to expand to the United States. It chose to enter the market by acquisition, and its targets were two U.S. companies, Anchor Glass Container Corp. and Latchford Glass Co. Anchor was the second largest glass container producer in the United States and a publicly traded company. Latchford was a closely held regional glass container producer headquartered in California.

Vitro did not have glassmaking plants of its own in the United States, but had inched into the market by organizing marketing and distribution subsidiaries. In December 1988, Vitro reorganized these subsidiaries, and formed Vitro International Corp. as their U.S. holding company.

Then, in May 1989, Vitro organized C Holdings Corp. to be an acquisition company. Vitro merged C Holdings into Container Holdings Corp. in April 1990. (We refer to them collectively as Container.) Container's purpose was to help Vitro gain control of Anchor and Latchford. As is common in takeovers, Container then formed a shell corporation to acquire Anchor's and Latchford's stock. The plan was that this shell—THR Corp.—would get the stock, and then merge with Anchor and Latchford to form one large operating subsidiary under Container.

With the targets in sight and its squadron of acquisition vehicles ready to roll, Vitro next had to arm itself with financing. But here Vitro ran into a problem common to Mexican companies in the late '80s—an inability to rely on Mexican financing due to the peso devaluations of 1982 and 1987 which had left even the Mexican government unfinanceable. This made Vitro unfinanceable, because Standard & Poor or Moody's will not give a borrower a higher credit rating than that of its sovereign. Vitro needed to look elsewhere. It turned to two U.S. investment banks—Lazard, Freres & Co. and Donaldson, Lufkin & Jenrette (DLJ)—for help in negotiating the financing and strategy of what Vitro expected would be a hostile takeover.

Vitro wanted ultimately to finance the acquisition using a combination of bank debt, equity, and high-yield (or, as unwilling corporate targets usually called them, junk) bonds. But before Vitro could get permanent financing, it needed bridge financing for the tender offer. (Bridge financing is short-term financing that aims to provide money for a transaction. It is meant to be repaid after a borrower closes the transaction and can access the capital markets for a mix of short- and long-term debt and equity financing.) DLJ committed up to $295 million in bridge financing to Vitro because DLJ expected that once THR merged into Anchor and Latchford it would be a creditworthy operating company. DLJ formed Anchor Bridge Partnership with The Equitable Companies (DLJ's corporate parent) and a syndicate of banks

to make the bridge loan to THR. Lazard and DLJ also lined up the components of what they expected would be the permanent financing for the acquisitions: hundreds of millions of dollars in bank loans and debt securities.

The plan began well. In the summer of 1989, Vitro and Container started quietly buying Anchor stock on the open market. Vitro contributed its shares to Container. By the end of July 1989, Container held 10.1 percent of Anchor's 14 million outstanding shares. Vitro then made a tender offer for the rest in August 1989. Anchor initially resisted, but after testing the market for alternatives, surrendered. [1]

The sale was set to close on November 2, 1989, but on October 10, 1989, the junk-bond market collapsed when, in a completely unrelated development, the management of United Airlines found it could not finance its leveraged buyout. Without a market for junk bonds, Vitro's bridge financing looked like it might turn into bridge-to-nowhere financing. What followed was one temporary solution after another.

Vitro first scrambled to find the money it needed to complete the tender offer:

• On October 29, 1989, a group of banks led by Security Pacific National Bank loaned THR $139 million. This SPNB 1989 tender offer loan was due in six months.

• On November 2, 1989, THR issued $155 million of senior subordinated floating rates notes (THR 1989 bridge note) to Anchor Bridge. The THR 1989 bridge note was due in one year. [2]

• On November 2, 1989, Container made a $128 million equity contribution to THR in cash and Anchor and Latchford stock in exchange for THR stock.

• On November 2, 1989, Container loaned $25 million to THR (THR 1989 bridge loan). Vitro loaned $25 million to Container to make the loan to THR. (Vitro 1989 bridge loan.) Both loans were due in one year.

By the end of 1989, the deal looked like this:

---

[1] In a friendlier takeover, Container also acquired all of Latchford's stock during 1989. This deal was much smaller than the Anchor acquisition, only about $41 million, and Latchford was later merged into Anchor.

[2] This THR 1989 bridge note is the one to keep an eye on in the diagrams below.



After the tender offer closed, THR owned 99 percent of Anchor's stock. Anchor redeemed the rest for cash in May 1990, which made Anchor a wholly owned subsidiary of THR. Vitro expected to refinance the SPNB 1989 tender offer loan and the THR 1989 bridge note as soon as the junk-bond market stabilized.

Then more bad news shattered any hopes Vitro had of financing the deal through junk bonds: On February 13, 1990, Drexel Burnham Lambert filed for bankruptcy. Drexel had created the high-yield bond market, but the market's collapse took Drexel with it and spurred a shift from debt to equity in the financing of the takeovers. [3]

On May 2, 1990, the SPNB 1989 tender offer loan became due. Vitro needed more time. To buy some, Vitro refinanced Anchor's debt with a loan from the group of banks with SPNB as their agent. SPNB divided the $268 million debt into two loans (SPNB 1990 loans):

---

[3] For a summary of Drexel's collapse see Siconolfi et al., "Rise and Fall: Wall Street Era Ends As Drexel Burnham Decides to Liquidate", Wall St. J., Feb. 14, 1990, at A1.

• A $208 million term loan to refinance existing Anchor debt, pay related fees and expenses, and provide working capital for Anchor.

• A $60 million revolving credit loan to provide working capital for Anchor and Latchford (SPNB 1990 revolving loan).

The SPNB 1990 loans matured on July 31, 1994, and came with two conditions:

• Vitro had to contribute $184 million to the capital of THR through Container to repay the SPNB 1989 tender offer loan, and repay a portion of principal due on the THR 1989 Bridge Note as well as the accrued interest.

• SPNB could restrict the amount of other debt allowed at Anchor and the amount of money that could be paid out of Anchor to THR.

These conditions affected the THR/Anchor merger. When THR issued the THR 1989 Bridge Note, it expected to refinance the note after the merger, but SPNB's restrictions would not allow it to move that debt to Anchor as part of any refinancing. As a result, DLJ and Vitro decided that they needed to make the indebtedness more marketable if they were going to refinance the THR 1989 Bridge Note without Anchor.

Vitro decided that moving the Note to a U.S. subsidiary outside the Container group would do this. It chose International because that company had enough cashflow from its operations to service at least part of the Note. DLJ requested that Vitro guarantee the debt as consideration for the restructuring. Vitro then restructured the Note through a series of transactions:

• On May 2, 1990, International issued $151 million of senior notes (International 1990 bridge note) to Anchor Bridge, with $30 million of principal due December 31, 1990, $26 million of principal due December 31, 1991, and the unpaid principal balance due May 1, 1992. International loaned the proceeds to THR. Vitro guaranteed the International 1990 bridge note.

• On May 2, 1990, THR issued a $151 million note (THR 1990 senior note) to International. THR used the proceeds to repay the balance of the THR 1989 Bridge note. [4] The THR

---

[4] With the THR 1989 bridge note paid, shift attention to this THR 1990 senior note and the International 1990 Bridge note described above.

1990 senior note was a "pay-in-kind"[5] note because of the SPNB restrictions on Anchor, and Vitro expected that money from Anchor would eventually pay the note. The THR 1990 senior note matured April 2, 1995.

• On May 2, 1990, the Vitro 1989 Bridge Loan was converted into equity and canceled.

To make the first payment on the International 1990 Bridge note, International borrowed $31 million from Banca Serfin (Banca Serfin 1990 loan), a Mexican bank. Vitro guaranteed International's obligations under the Banca Serfin 1990 Loan. The Banca Serfin 1990 Loan matured in March 1991.

All this work on the financing side of the deal would have been fruitless without success on the operations side. And there the initial hopes that Vitro brought to the deal seemed to be justified. By 1991 the increased production capacity was having the desired effect, and Vitro's margins on glass containers were improving. With higher margins, Anchor increased its annual cashflow from $100 million to $200 million. But with the financial markets still depressed, Vitro and DLJ agreed that they needed to refinance one more time before they could finally move the debt to Anchor.

To refinance the debt, International was to issue 21 senior notes (together, the International 1991 senior notes) worth a total of $155 million. The problem was that no one expected International to have sufficient cashflow to make the payments on the International 1991 senior notes unless THR made its payments on the THR 1990 senior note. But THR was not required to make payments; remember, the THR 1990 senior note was a pay-in-kind note. DLJ advised that for International to take on that amount of debt it would need some credit support or the notes would not be marketable.

The needed credit support came from Vitro's guaranty of the International 1991 senior notes. The guaranty allowed the note purchasers to collect from Vitro if International defaulted. Vitro was chosen as guarantor over Anchor because it had a lower debt-to-equity ratio than Anchor, and SPNB's restrictions on Anchor would not allow the latter to be a guarantor. On March 28, 1991, International issued the

---

[5] A "pay-in-kind" note allows the borrower to increase the principal of the note rather than pay interest in cash.

International 1991 senior notes to a group of U.S. insurance companies and Vitro guaranteed the notes pursuant to a guaranty agreement.

Here's the graphic:



International used the proceeds to repay and cancel the International 1990 Bridge note and Banca Serfin 1990 Loan.

International made the following guaranty-fee payments to Vitro on the International 1991 senior notes:[6]

| Year | Amount |
| --- | --- |
| 1992 | $2,309,758 |
| 1993 | 1,912,867 |
| 1994 | 2,485,470 |

It is the tax treatment of these fees that is at issue in this case. The guaranty agreement set the fee at 1.5 percent of

---

[6] International also paid a guaranty fee for Vitro's guaranty of the International 1990 Bridge note, but paid it in 1991, a year not at issue here.

the outstanding principal balance of the notes per year. This 1.5-percent fee was standard—Vitro charged all of its subsidiaries the same fee no matter the subsidiary's capital structure or financial condition. And Vitro's willingness to guarantee its subsidiaries' debt was not limited to International: Vitro's policy was to give a guaranty to any subsidiary whenever it asked for one. The fees were not tied to the amount of work Vitro did to negotiate or monitor the guaranty. Vitro's estatutos (or bylaws) expressly provided that one of Vitro's business purposes was to guarantee the debts of its subsidiaries.

International did not withhold U.S. income taxes from the fees. And, as expected, it also did not have the cashflow to make the interest payments on the International 1991 senior notes. To make those payments, Vitro and Container contributed almost $80 million in capital to International from 1990 to 1994. But the money didn't help. At the end of 1993, soft-drink producers began switching to plastic containers, and in eighteen months the glass-container industry lost one-third of its demand. And then a merger of other glass-container producers knocked Vitro into third place in the U.S. market, a now-shrinking market where it turned out there was room for only two players. Anchor's profits melted into losses. It filed for bankruptcy in 1997.

The Commissioner's response to this series of unfortunate events was to determine that International should have withheld 30 percent of the guaranty fees it paid to Vitro in 1992–94. The Commissioner sent Container a notice of deficiency, and Container timely petitioned us to redetermine its liabilities. Container is a Delaware corporation with its principal place of business in Texas. We tried the case in Dallas.

## *Discussion*

Section 881(a)[7] imposes a 30-percent tax on "fixed or determinable annual or periodical" (FDAP) income received from sources within the United States by a foreign corporation, "but only to the extent the amount so received is not effectively connected with the conduct of a trade or business within the United States." Taxes owed under section 881(a)

---

[7] Unless otherwise noted all section references are to the Internal Revenue Code for the years in issue. The single Rule reference is to Tax Court Rule of Practice and Procedure 155.

are generally supposed to be withheld at the source. Sec. 1442(a). Thus, for Container to be liable under section 881(a) the guaranty fees must be: (1) FDAP income and (2) received from a U.S. source. See secs. 881(a), 1441(a), (b), 1442(a).

The parties agree that the guaranty fees, paid regularly in fixed amounts, are FDAP income.[8] The key question in this case is whether the second requirement is met—was the source of the guaranty fees the United States or Mexico?

We determine FDAP income's source by using the rules in sections 861 to 863. Two rules are especially important here. The first is for interest—the rule is that the source of interest is the residence of the obligor. Secs. 861(a)(1), 862(a)(1); sec. 1.861–2, Income Tax Regs. The Commissioner would like the guaranty fees to be treated as interest, because International is a U.S. company.

The second rule that's especially important here is the rule on services—that rule is that the source of services is where the services are performed. Secs. 861(a)(3), 862(a)(3); sec. 1.861–4, Income Tax Regs. Container would like the guaranty fees to be treated as payments by International for a service performed by Vitro in Mexico.

The sourcing rules are not comprehensive. If a category of FDAP is not listed, caselaw tells us to proceed by analogy. In other words, if the guaranty fees were neither interest nor payment for services rendered, we would still have to figure out whether they were more like interest or more like payment for services rendered (or, possibly, some other category of FDAP that has a specific sourcing rule). See *Hunt v. Commissioner*, 90 T.C. 1289, 1301 (1988); *Howkins v. Commissioner*, 49 T.C. 689, 693–95 (1968); *Bank of Am. v. United States*, 230 Ct. Cl. 679, 686, 680 F.2d 142, 147 (1982), affg. in part and revg. in part 47 AFTR 2d 81–652, 81–1 USTC par. 9161 (Ct. Cl. 1981).

A. *Guaranty Fees as Interest*

Interest is "compensation for the use or forbearance of money." *Deputy v. du Pont*, 308 U.S. 488, 498 (1940); *Sharp*

---

[8] The Code defines FDAP income broadly, and includes in it virtually all kinds of income except capital gains from the sale of property. See *Wodehouse v. Commissioner*, 337 U.S. 369, 393–94 (1949); see also sec. 1.1441–2(a), Income Tax Regs. (defining FDAP income for the years at issue); sec. 1.881–2(b), Income Tax Regs. (referring to definition of FDAP income in sec. 1.1441–2, Income Tax Regs.). The current regulations—in effect for payments made after December 31, 2000—define FDAP income in section 1.1441–2(b)(1)(i), Income Tax Regs.

*v. Commissioner*, 75 T.C. 21, 24 (1980), affd. 689 F.2d 87 (6th Cir. 1982). We agree with the parties that Vitro's guaranty was not a loan to International, so the guaranty fees are not interest.

B. *Guaranty Fees as Payment for Services*

Sections 861(a)(3) and 862(a)(3) specifically source "labor or personal services," and Container argues that that is what Vitro performed for International. Under the Guaranty agreement, Vitro was required to maintain records and supply information to the note purchasers. It performed these acts using Corporativo personnel, facilities, equipment, and capital—all located in Mexico. Container asks us to find that the guaranty fees were compensation for these services and are therefore Mexican source income. See *Commissioner v. Piedras Negras Broad. Co.*, 127 F.2d 260 (5th Cir. 1942), affg. 43 B.T.A. 297 (1941); *Dillin v. Commissioner*, 56 T.C. 228, 244 (1971) (explaining that where the benefits of the services are received or where a guaranty agreement was entered into does not affect the source of services).

The Commissioner does not challenge Container's assertion that Corporativo performed services, but argues that services were not the predominant feature of the guaranty and should be ignored for sourcing purposes. See *Bank of Am.*, 230 Ct. Cl. at 690, 679 F.2d at 149. Container responds by arguing that providing services is not a possible feature of a guaranty, but that a guaranty is itself a service; indeed, that the Code and regulations actually refer to guaranties as services.

We'll therefore analyze Container's arguments on this point at some length. They flow from four sections of the Code or regulations. The first is based on section 1.731–2(e)(3)(iii), Income Tax Regs., which deals with partnership distributions. This section does include the words "services" and "guarantees of obligations," but it does not suggest that a guaranty is a service. And "guarantees of obligations" is actually tucked away in a parenthetical listing types of equity interests.[9] Container's two other references are also of little help,[10] but Container also asks us to look at transfer pricing of services under section 482.

---

[9] This regulation wasn't issued until 1996. T.D. 8707, 1997–1 C.B. 128.

[10] The second is section 954(h), which defines a "lending or finance business" as the business of, among other things, providing guaranties and rendering services or making facilities avail-

This might be a useful guide. Section 482's purpose "is to ensure that taxpayers clearly reflect income attributable to controlled transactions, and to prevent the avoidance of taxes with respect to such transactions." Sec. 1.482–1T(a)(1), Temporary Income Tax Regs., 58 Fed. Reg. 5272 (Jan. 21, 1993).[11] For example, if a U.S. corporation guarantees a loan made to its foreign subsidiary by a third party without receiving compensation from the foreign sub, it could avoid the income it would have incurred had it charged a fee. But the guaranty adds some value, and the section 482 regulations tell taxpayers that the U.S. parent should recognize the amount it would have charged had the transaction been made at arm's length with an uncontrolled third party. See sec. 1.482–1T(b), Temporary Income Tax Regs., 58 Fed. Reg. 5272 (Jan. 21, 1993). But this is just a summary of a general rule. When it comes to deciding whether payments for a guaranty are services in particular transfer-pricing situations, the Commissioner has struggled.

In General Counsel Memorandum (GCM) 38499 (Sept. 19, 1980),[12] the Commissioner agreed with a proposed revenue ruling[13] concluding that the "guarantee of the parent constitutes the performance of a service for the subsidiary." The Commissioner used section 1.482–2(b)(7)(v), *Example* (*9*), Income Tax Regs., to reach this result.

*Example* (*9*). X is a domestic manufacturing corporation. Y, a foreign subsidiary of X, has decided to construct a plant in Country A. In connection with the construction of Y's plant, X draws up the architectural plans for the plant, arranges the financing of the construction, negotiates with var-

---

able in connection with providing guaranties. This subsection wasn't even part of the Code until 1997, see Taxpayer Relief Act of 1997, Pub. L. 105–34, sec. 1175(a), 111 Stat. 990; and its only relevance to solving the problem we face is that the words "service" and "guarantee" are in the same subsection. Container also cites a group of cases that hold that guaranty fees are deductible as ordinary and necessary business expenses under section 162, see, e.g., *A. A. & E. B. Jones Co. v. Commissioner*, T.C. Memo. 1960–284; *Tulia Feedlot, Inc. v. United States*, 3 Cl. Ct. 364 (1983), but do not explain how deductibility makes a guaranty a service.

[11] Section 1.482–1T(g)(8), Temporary Income Tax Regs., 58 Fed. Reg. 5282 (Jan. 21, 1993), defines "controlled transaction" as "any transaction or transfer between two or more members of the same group of controlled taxpayers." Controlled taxpayers are "taxpayers owned or controlled directly or indirectly by the same interests." Sec. 1.482–1T(g)(5), Temporary Income Tax Regs., 58 Fed. Reg. 5282 (Jan. 21, 1993).

[12] Although GCMs have no precedential value, they are "helpful in interpreting the Tax Code when 'faced with an almost total absence of case law.'" *Morganbesser v. United States*, 984 F.2d 560, 563 (2d Cir. 1993) (quoting *Herrmann v. E.W. Wylie Corp.*, 766 F. Supp. 800, 802–03 (D.N.D. 1991)).

[13] The proposed revenue ruling was never published. See Field Service Advice Memoranda, 1995 FSA LEXIS 135 at 16 (May 1, 1995).

ious Government authorities in Country A, invites bids from unrelated parties for several phases of construction, and negotiates, on Y's behalf, the contracts with unrelated parties who are retained to carry out certain phases of the construction. Although the unrelated parties retained by X for Y perform the physical construction, the aggregate services performed by X for Y are such that they, in themselves, constitute a construction activity. * * * [14]

The proposed revenue ruling also concluded that guaranty fees should be sourced to the country where the financing is secured and where the subsidiary resides because that is the situs of the risk of default. In the General Counsel Memorandum, the Commissioner expressed reservations about that conclusion and suspended further consideration.[15] GCM 38499 (Sept. 19, 1980).

We also have some caselaw. In *Centel Commcns. Co. v. Commissioner*, 92 T.C. 612 (1989), affd. 920 F.2d 1335 (7th Cir. 1990), we decided that the guaranties were not a service, though in a very different context: A burgeoning telephone interconnect business got a loan to provide it with operating funds. *Id.* at 616. As a condition of the loan, the lender required guaranties from three of the company's shareholders. *Id.* The shareholders signed the agreements without compensation, but five years later they received stock warrants for their guaranties. *Id.* at 617–19. The issue we decided was whether the warrants were given for the performance of services under section 83(a). *Id.* at 626. We held that "within the meaning of section 83" the shareholder had not performed a service. *Id.* at 633.

"[W]ithin the meaning of section 83" is the key. We did characterize the guaranties as "shareholder/investor actions to protect their investment * * * [that] as such do not constitute the performance of services." *Id.* at 632–33. But we

---

[14] At the time of the GCM's release, the section 482 regulations were in final form. In 1993, temporary regulations were issued. 58 Fed. Reg. 5263 (Jan. 21, 1993). The final regulations were issued in 1994, but didn't go into effect until tax years beginning after October 6, 1994. T.D. 8552, 1994–2 C.B. 93. Throughout the regulation's final-to-temporary-to-final journey, "*Example* (*9*)" remained unchanged. But that example was removed from section 1.482–2 by T.D. 9278, 2006–2 C.B. 256.

[15] Guaranties come up again in section 1.482–9T(b)(3)(ii)(H), Temporary Income Tax Regs., 71 Fed. Reg. 44489 (Aug. 4, 2006). That section excludes guaranties from the "services cost method" of pricing a "controlled services transaction." Treatment of Services Under Section 482; Allocation of Income and Deductions From Intangibles; Stewardship Expense, 71 Fed Reg. 44466, 44474 (Aug. 4, 2006). But the Commissioner immediately cautions that the express exclusion shouldn't be read as a recognition of a general rule of inclusion: "[N]o inference is intended by this exclusion that financial transactions (including guarantees) would otherwise be considered the provision of services for transfer pricing purposes." *Id.*

also stressed that our decision turned on a question of fact: whether the shareholders got the warrants in exchange for services rendered as employees or independent contractors. *Id.* at 629. The parties agreed the shareholders weren't employees, and we found that they were not independent contractors because they were not in the business of guaranteeing loans. *Id.* at 632. We did not hold that providing a guaranty is never a service, and noted that we were analyzing only the language of section 83. An analysis under that section is quite different from an analysis under the sourcing rules, but it nevertheless prompted the Commissioner to rethink his position when the problem came up in the transfer-pricing context again. This time he reasoned that

The *Centel* decision increases the litigating hazards * * * . However, we do not read this case as contradicting the position of the Service as established in * * * G.C.M. 38499. Guarantees do not fit comfortably within normal tax law concepts in a number of areas and, consequently, there are substantial arguments that can be made against any possible analysis of guarantees. * * * [1995 WL 1918236 (IRS FSA May 1, 1995).]

All we can conclude from this detour through transfer-pricing law is that it will not help us reach a reasonable conclusion on whether guaranties are services under section 861.

So we'll fall back on the dictionary. The common meaning of "labor or personal services" implies the continuous use of human capital, "as opposed to the salable product of the person's skill." [16] Under this definition, we find that Container failed to prove that Corporativo performed sufficient "labor or personal services" to justify the $6 million International paid in guaranty fees over three years. Container presented very little evidence about the specific acts Corporativo performed and how much time it took to perform them. For example, Container's posttrial brief explains that the Guaranty agreement required Vitro to "take certain actions, confirm certain facts, provide certain information, and create and supply certain documents." The Guaranty agreement required only minimal accountings and reporting to the note purchasers. In any event, the fees were not tied to the amount of work that

---

[16] See Black's Law Dictionary 890 and 1180 (8th ed. 2004) (defining "labor" and "personal service").

Vitro did, but to the amount of the outstanding principal that Vitro was standing behind. This leads us to hold that International did not pay the guaranty fees to Vitro as compensation for services. The value of Vitro's guaranty stems "from a promise made and not from an intellectual or manual skill applied." *Bank of Am.*, 47 AFTR 2d at 81–657.

We therefore move on to reasoning by analogy, and ask whether guaranty payments are more like interest or more like services.

C. *Guaranty Fees as Analogous to Interest or Payments for Services*

When we source FDAP income by analogy, our goal is to find the "source of income in terms of the business activities generating the income or * * * the place where the income was produced. Thus, the sourcing concept is concerned with the earning point of income or, more specifically, identifying when and where profits are earned." *Hunt*, 90 T.C. at 1301 (citation omitted).

There are only a few examples in the caselaw of sourcing by analogy. Alimony was the first. The question of its source arose when a U.S. resident paid alimony to his British ex from an English bank. We held that the alimony's source was the ex-husband's residence, and not where the funds were deposited or where the divorce decree was entered. See *Manning v. Commissioner*, 614 F.2d 815 (1st Cir. 1980), affg. T.C. Memo. 1979–146; *Howkins*, 49 T.C. at 694. Taking perhaps too modern a view of marriage, we reasoned that alimony, like interest, is not exchanged for property or services. And since interest is sourced to the residence of the obligor, so too would we source alimony. *Howkins*, 49 T.C. at 694.

Another example of sourcing by analogy came from the Court of Claims in *Bank of America*. In that case, the court sourced commissions received by Bank of America from foreign banks in connection with transactions involving commercial letters of credit. *Bank of Am.*, 230 Ct. Cl. at 680–681, 680 F.2d at 143. The conflict in *Bank of America*, as in this case, was whether the commissions should be sourced by analogy to personal services or to interest. *Id.* at 686–687, 680 F.2d at 147.

To understand the holding in *Bank of America* requires some background in letters of credit. Such letters make trade easier by allowing a bank, rather than the seller, to examine a buyer's credit. For example, when a U.S. exporter wants to sell goods to a foreign buyer, assessing the creditworthiness of the foreign buyer can be a problem. So, instead of having the seller do it, the buyer requests a letter of credit from a foreign bank and the foreign bank does the job. If the buyer is creditworthy, the foreign bank (sometimes called the opening bank) substitutes its credit for the buyer's and commits to pay the seller when certain conditions are met, e.g., presentment of an inspection certificate and a bill of lading to the opening bank. After the opening bank pays the seller, the buyer reimburses it. There are two types of commercial letters of credit: sight and time. A sight letter of credit obligates the opening bank to pay as soon as the seller meets the conditions in the letter of credit. A time letter of credit obligates the opening bank to pay on a specific future date if the conditions were met. See *id.* at 681, 680 F.2d at 144.

BofA performed four kinds of transactions involving letters of credit, and charged the opening bank commissions for three of them.[17] It's these three, and how the Court of Claims sourced each of them that are useful here. The first kind was an acceptance, and BofA received acceptance commissions in two situations—if BofA determined that the conditions of a time letter of credit had been met it would stamp the letter accepted, obligating itself to pay any holder in due course when the letter came due; or, if an opening bank with an established line of credit with BofA wanted to refinance a letter of credit, it would accept a time draft at a discount to the face amount of the letter of credit.

The Court of Claims began its analysis by noting that both these types of acceptance transactions are similar to a loan and that the commissions "include elements covered by the interest charges made on direct loans." *Id.* at 689, 680 F.2d at 148. The court also held that the predominant feature of an acceptance transaction was the substitution of BofA's credit for that of the opening bank and not the services BofA performed. *Id.* at 690, 680 F.2d at 149. These factors led the

---

[17] BofA did not charge the opening bank to advise a letter of credit. It "advised" a letter of credit by informing the seller that a letter was issued in its favor and forwarding the letter to the seller.

Court of Claims to source acceptance commissions by analogy to interest, with the obligor being the opening bank. *Id.* at 689, 680 F.2d 148.

BofA also received confirmation commissions. It confirmed sight letters of credit by advising the letter and committing to pay the letter's face amount after the seller met its conditions. The opening bank reimbursed BofA by either prepaying it or by keeping an account that BofA could debit. When the opening bank prepaid, BofA didn't charge a commission. Otherwise it charged a commission that reflected its assumption of the risk that the foreign bank could default. The Court of Claims again found that the performance of services was a part of the deal but that its predominant feature was BofA's substituting its credit for the opening bank's. *Id.* at 691, 680 F.2d at 149–50. The court also thus sourced confirmation commissions, as it had acceptance commissions, by analogy to interest and with the obligor being the opening bank. *Id.* at 691–92, 680 F.2d at 150.

Finally, the Court of Claims examined negotiation commissions. Negotiations took place when BofA determined if the seller met the conditions for payment in the letter of credit. After BofA performed a negotiation, it would forward the papers to the opening bank, which would do an independent check. The Court of Claims found that negotiation commissions were paid for services performed in the United States and were distinguishable from the other two types of commission because the only risk that BofA assumed was that it might improperly determine that the seller met the conditions. *Id.* at 692, 680 F.2d at 150.

The Commissioner argues that *Bank of America* is controlling because acceptance and confirmation commissions, like guaranty fees, are uses of another's credit and are analogous to interest. But, as the Commissioner thoughtfully concedes, the "use" of credit is different in guaranties compared to acceptance and confirmation of letters of credit. When BofA confirmed or accepted a letter of credit, it assumed an unqualified primary legal obligation to pay the seller—it stepped into the shoes of the opening bank and substituted its own credit for the opening bank's. It was, in effect, making a short-term loan and the commissions approximated interest. *Id.* at 688–91, 680 F.2d at 148–50.

Vitro's case is different. It was augmenting International's credit, not substituting its own. But should this distinction matter? We conclude that it should, and begin our explanation by examining the effects of a default. When a debtor defaults on a loan, he is defaulting on an existing primary obligation. Default causes the creditor to lose the outstanding principal because he has already extended funds to the debtor. Interest is the creditor's compensation for putting his own money at risk. As in a loan, BofA put its money directly at risk when it paid the seller, and it charged for the risk—although it called that charge a "commission" rather then "interest". Vitro's obligation was, in contrast, entirely secondary. Unlike a lender, Vitro was not required to pay out any of its own money unless and until International defaulted. And Vitro's guaranty might not even put its money at risk after default, because if International defaulted and Vitro paid the 1991 International senior notes, it would step into the note purchasers' shoes and acquire any rights that they had against International. See *Putnam v. Commissioner*, 352 U.S. 82, 85 (1956). Vitro loses only if International defaults and Vitro repays the 1991 International senior notes (which transfers International's obligation from the note purchasers to Vitro) and then International defaults on the transferred debt.

Vitro's guaranty therefore lacks a principal characteristic of a loan because Vitro did not extend funds to International. To find otherwise would require us to assume that at the time of the guaranty, the 1991 International senior notes was somehow a loan to Vitro. Neither party makes this argument.[18] Vitro's later choice to subsidize International through capital contributions—instead of allowing International to default—does not affect our analysis. Capital contributions also lack a distinguishing characteristic of a loan—a promise to repay.

The Commissioner argues, however, that if guaranties are unlike loans because the guarantor does not have to hand over his money at the outset, guaranty fees may be like

---

[18] Container makes an alternative argument that Vitro's guaranty was in the nature of a surety bond and is subject to tax under section 4371 and not section 881(a), 1441, or 1442. This argument requires us to disregard the Guaranty agreement as a separate obligation and treat Vitro as if it were a party to the International 1991 senior notes. We are not persuaded and find that the Guaranty agreement was a separate and distinct obligation.

interest in some broader sense under *Howkins*. That case, the Commissioner argues, held that alimony is analogous to interest because it is not paid for property or services. *Howkins*, 49 T.C. at 694. Reading *Howkins* this way, however, is reading it less as a useful analogy than as creating a default rule. Property and services are listed in sections 861 and 862, so by definition, any unlisted type of income is not paid for property or services. And if we were to follow such reasoning without qualification, we would source all unlisted types of income by analogy to interest. But we read *Howkins* more narrowly; we reasoned there that alimony is analogous to interest because its source is the obligor. *Howkins*, 49 T.C. at 693. This logic also reminds us of the goal of sourcing by analogy: namely, find the location "of the business activities generating the income or * * * the place where the income was produced." *Hunt*, 90 T.C. at 1301. So we have to ask if there's a useful analogy to guaranty fees that would help us figure out, in some reasonable way, where they are produced.

International paid Vitro to guarantee the 1991 International senior notes. These fees compensated Vitro for incurring a contingent future obligation to either pay International's debt or make a capital contribution. Vitro was able to make this promise because it had sufficient Mexican assets—and its Mexican corporate management had a sufficient reputation for using those assets productively—to augment International's credit and enable the long and complex series of financings we charted at the beginning of this opinion to keep going as long as it did. So we conclude that it is Vitro's promise and its Mexican assets that produced the guaranty fees.[19]

We do not choose International as the source of the income because the guaranty fees were not like alimony: Alimony is only an obligation to pay, because once a court orders one spouse to pay alimony, nothing more is required of the other spouse. Guaranty fees are different—they are payments for a possible future action.

We think that makes guaranties more analogous to services. Guaranties, like services, are produced by the obligee

[19] The parties did not argue the point, but in this sense the guaranty fees were somewhat analogous to rents or royalties for the use of Vitro's goodwill, see sec. 862(a)(4), which would also source them to Mexico rather than the United States.

and so, like services, should be sourced to the location of the obligee. See secs. 861(a)(3), 862(a)(3); *Hunt*, 90 T.C. at 1301. We realize that we are deciding a close question, but an analogy to interest has too many shortcomings: Guaranty fees do not approximate the interest on a loan; Vitro, not International, produced the guaranty fees; and Vitro's guaranty was not an obligation to pay immediately, but a promise to possibly perform a future act.

## Conclusion

We hold that International was not required to withhold taxes on the guaranty fees that it paid Vitro because those fees are Mexican source income. The parties settled various other issues, however, so

*Decision will be entered under Rule 155.*